**CAYUGA INDIAN NATION OF NEW YORK, et al., Plaintiffs,**

and

**The Seneca-Cayuga Tribe of Oklahoma, Plaintiff-Intervenor,**

v.

**Mario M. CUOMO, et al., Defendants.**

**Nos. 80–CV–930, 80–CV–960.**

United States District Court, N.D. New York.

Aug. 21, 1987.

Marks Murase & White (Arthur J. Gajarsa, Kenneth A. Marra, of counsel), Washington, D.C., Meggesto & Meggesto (Judy Lewis Meggesto, of counsel), Syracuse, N.Y., for plaintiffs.

Wiles Fahey & Lynch (Joseph E. Fahey, of counsel), Syracuse, N.Y., Ziontz Pirtle Morisset Ernstoff & Chestnut (Glenn M. Feldman, of counsel), Washington, D.C., for plaintiff-intervenor Seneca-Cayuga Tribe of Oklahoma.

Robert Abrams, Atty. Gen. of State of New York, Dept. of Law (David Roberts, Asst. Atty. Gen., of counsel), Albany, N.Y.

Huber Lawrence & Abell (Howard M. Schmertz, of counsel), New York City, for New York State Elec. & Gas Corp.

Hiscock & Barclay (Richard Hughes, Clifford Wilson, of counsel), Syracuse, N.Y., for Consol. Rail Corp.

Hale and Dorr (James D. St. Clair, William F. Lee, of counsel), Boston, Mass., for Seneca County, et al.

Goodwin Procter & Hoar (Allan van Gestel, of counsel), Boston, Mass., for Cayuga County, et al.

Thomas H. Pacheco, Indian Resources Section, Land and Natural Resources Div., Washington, D.C., for United States amicus curiae.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

In this action, one of a number with which the court has dealt involving Indian land claims, the court is being asked by the plaintiff, the Cayuga Nation of New York, and the plaintiff-intervenor, the Seneca-

Cayuga Tribe of Oklahoma (the plaintiffs),[1] to determine that two conveyances of land, one occurring in 1795, and the other occurring in 1807, violated the Nonintercourse Act (or the Act), 25 U.S.C. § 177. The court has already written one lengthy opinion in this action denying the defendants' motions to dismiss, and in that opinion, with which familiarity will be presumed, the court set forth in detail the basic factual background of this action. *Cayuga Indian Nation of New York v. Cuomo*, 565 F.Supp. 1297 (N.D.N.Y.1983) (McCurn, J.). Currently pending before the court are a motion by the plaintiffs for partial summary judgment and motions by the defendants for summary judgment made pursuant to Fed.R.Civ.P. 56.

Before addressing the merits of the motions, the court should make clear its role at this stage of the proceedings. In a recent trilogy of cases, the Supreme Court has illuminated the responsibility of the district court and the burdens on the parties when dealing with summary judgment motions. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In *Anderson,* the Court stated:

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2725, pp. 93–95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

106 S.Ct. at 2510. The Court went on to state:

Our prior decisions may not have uniformly recited the same language in describing genuine factual issues under Rule 56, but it is clear enough from our recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. As *Adickes [v. S.H. Kress & Co.*, 398 U.S. 144 [90 S.Ct. 1598, 26 L.Ed.2d 142] (1970) ], *supra,* and [*First National Bank of Arizona v.] Cities Service [Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) ], *supra,* indicate, there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Cities Service,* 391 U.S., at 288–289, 88 S.Ct., at 1592. If the evidence is merely colorable, *Dombrowski v. East-*

---

**1.** The court need not resolve any dispute at this time between the plaintiff and the plaintiff-in-   tervenor as to who has the actual right to claim interest in the land in question.

*land,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) *(per curiam),* or is not significantly probative, *Cities Service, supra,* [391 U.S.] at 290, 88 S.Ct. at 1592, summary judgment may be granted.

*Id.* at 2511. In *Celotex,* the Court discussed the burden on a party opposing a motion for summary judgment:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. "[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)...." *Anderson v. Liberty Lobby, Inc.,* [477] U.S. [242], [——], 106 S.Ct. [2505], [——], 90 [91] L.Ed.2d [202] (1986).

106 S.Ct. at 2552–53. With the procedural fundamentals of summary judgment motions firmly in hand, the court will proceed to address the merits of the pending motions.

## I.

The most recent pronouncement of the Nonintercourse Act, which has been in effect in various versions for almost two hundred years, is as follows:

§ 177. Purchases or grants of lands from Indians

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000. The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the approbation of the commissioner of the United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty.

25 U.S.C. § 177.

The plaintiffs contend that the 1795 and 1807 conveyances of land, made pursuant to treaties with the State of New York, were invalid under the Act because the requisite federal government ratification was never received.

■ To establish a violation of the Nonintercourse Act, a plaintiff must show that: (1) it is or represents an Indian tribe within the meaning of the Act; (2) the parcels of land at issue are covered by the Act as tribal land; (3) the United States has never consented to the alienation of the tribal land; and (4) the trust relationship between the United States and the tribe has never been terminated or abandoned. *Oneida Indian Nation of New York v. County of Oneida,* 434 F.Supp. 527, 537–38 (N.D.N.Y. 1977), *aff'd and rem'd,* 719 F.2d 525 (2d Cir.1983), *aff'd in part and rev'd in part,* 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985); *Mashpee Tribe v. New Seabury Corp.,* 427 F.Supp. 899, 902 (D.Mass.1977).

■ The defendants, asking for no quarter and giving none, are battling the plaintiffs right from the start by arguing that the plaintiffs have yet to prove their tribal existence. The plaintiffs argue, among other things, that they are recognized as

Indian tribes by the federal government and that the federal government has had a continuous relationship with them for a great number of years.

Based on affidavits by federal government officials that have been submitted to the court, there is no doubt that the federal government officially recognizes the Cayuga Nation of New York and the Seneca-Cayuga Tribe of Oklahoma as Indian tribes. The government acknowledges the Cayuga Nation of New York as the same tribe with whom it entered into the 1794 Treaty of Canandaigua,[2] and it recognizes the Seneca-Cayuga Tribe of Oklahoma as a successor tribe to the tribe with whom it treated in 1794. *See* Rainbolt Affidavit attached to Plaintiffs' Memorandum of Law in Support of Partial Summary Judgment and Krenzke Affidavits attached to Plaintiffs' Amended and Supplemental Motion for Summary Judgment and Memorandum of Plaintiff-Intervenor Seneca-Cayuga Tribe of Oklahoma in Response to Plaintiffs' Motion for Partial Summary Judgment.

The defendants maintain, however, that federal recognition is insufficient to establish tribal status for the purposes of a Nonintercourse Act claim and that the plaintiffs must prove that they have had a continuous tribal existence since the time of the challenged conveyances to the present time. In support of their position, the defendants rely primarily on *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575 (1st Cir.1979).

That case, though, does not stand for the proposition that federal recognition is irrelevant to a determination of tribal status. The Mashpees are not recognized as a tribe by the federal government. Consequently, the court was constrained to look for other evidence of tribal status and applied several different factors in making its ultimate determination. In recognizing the importance of federal recognition, the court did state:

> Because most groups of Indians involved in litigation in the federal courts have been federally recognized Indians on western reservations, the courts have been able to accept tribal status as a given on the basis of the doctrine going back at least to *The Kansas Indians*, 72 U.S. (5 Wall.) 737, 756–57, 18 L.Ed. 667 (1867), that the courts will accord substantial weight to federal recognition of a tribe. *See, e.g., Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 377 (1st Cir.1975).

*Id.* at 582.

In *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370 (1st Cir.1975), referred to above, the court was also confronted with a Nonintercourse Act claim where the plaintiff tribe lacked federal government recognition. The court proceeded to determine that the plaintiff was nonetheless still a "tribe" for purposes of a suit under the Act but did note that federal recognition would conceivably be of "great significance" in determining tribal status. *Id.* at 377.

The plaintiffs contend that the question of tribal status is a non-justiciable political question and that recognition of the tribes by the federal government is binding on the court. There is case authority in support of the plaintiffs' position. *See United States v. State of Washington*, 384 F.Supp. 312, 401 (W.D.Wa.1974), *aff'd*, 520 F.2d 676 (9th Cir.1975); *United States v. Aam*, 670 F.Supp. 306 (W.D.Wa.1986). In *Aam*, the court stated that "The Court must extend great deference to the political departments in determining whether Indians are recognized as a tribe. This determination closely resembles a political question, which should not be resolved by the courts. *Baker v. Carr*, 369 U.S. 186, 215

2. As set forth in the court's earlier opinion in this case:

[The Treaty of Canandaigua] acknowledged the Original Reservation retained by the Cayugas through their treaty of 1789 with New York State, and contained a promise by the United States that the land would remain theirs until the Cayugas "chose to sell the same to the people of the United States who have the right to purchase."

*Cayuga Indian Nation of New York v. Cuomo*, 565 F.Supp. 1297, 1304–05 (N.D.N.Y.1983).

[82 S.Ct. 691, 709, 7 L.Ed.2d 663] (1962)." At ——.

This court has itself recognized the importance of federal government determinations of tribal status. "The question of whether the plaintiffs are the proper parties is an issue which, as previously explained, is to be resolved whenever possible through executive determinations of tribal status." *Oneida Indian Nation of New York v. State of New York,* 520 F.Supp. 1278, 1301 (N.D.N.Y.1981) (McCurn, J.), *aff'd in part and rev'd in part,* 691 F.2d 1070 (2d Cir.1982). Moreover, in a recent First Circuit decision involving the Mashpees, that court could not have made much clearer the great deference that it gives federal government recognition of tribal status. *Mashpee Tribe v. Secretary of Interior,* 820 F.2d 480 (1st Cir.1987). The court initially discussed the history of the litigation and that a jury had found, as a matter of fact, that the Mashpees are not a tribe. The court went on, though, to refer to the "difficulty" in the Mashpees' case that resulted from the lack of federal executive or legislative branch recognition. *Id.* at 484. The court cited with approval the standard for federal recognition set forth by Professor Cohen,[3] and going even further, looked to a recently published federal government list of recognized Indian tribes as evidence of tribal status. *Id.* While the Mashpees and four other "tribes" involved in that litigation are not on the list, the Cayuga Nation of New York and the Seneca-Cayuga Tribe of Oklahoma are listed. 51 Fed.Reg. 25115 (July 10, 1986).

▪ Future court decisions may lead to a clear rule that the issue of tribal status is a political determination that binds the courts. As noted, there is some authority for that proposition at this time. However, even if a court is not bound by federal government recognition of a tribe, such recognition should be given great weight in any determination of tribal status. Notwithstanding the defendants' protests and presentation to the court of "questions of material fact" on the issue of tribal status, the court has little hesitation in holding that there is no genuine issue of material fact regarding the tribal status of either of the plaintiffs. The court concludes that, for the purposes of a Nonintercourse Act suit, tribal status of the Cayuga Nation of New York and the Seneca-Cayuga Tribe of Oklahoma has been established as a matter of law.

The second requirement in an action based on an alleged Nonintercourse Act violation is that the land in question must be covered by the Act as tribal land. There appears to be no dispute that the land under consideration in this case, that conveyed in 1795 and 1807, is covered by the Act as tribal land, and the court so concludes as a matter of law.

Similarly, advancing to the fourth requirement for a Nonintercourse Act suit, there is no argument regarding the existence of a trust relationship between the federal government and the plaintiff tribes. Obviously, the defendants have implicitly challenged any relationship with the tribes by challenging the existence of the tribes themselves. However, they have not addressed themselves specifically to the issue of a trust relationship. The affidavits by federal government officials mentioned earlier leave no doubt that the requisite trust relationship does exist, and the court concludes that this requirement has been met.

The third, and at this point, crucial requirement that the plaintiffs must meet is to establish that the federal government did not consent to the 1795 and 1807 conveyances. As stated in the Act itself, no conveyance is valid unless made by a treaty or convention entered into pursuant to the Constitution. 25 U.S.C. § 177. Not sur-

---

**3.** Normally a group will be treated as a [tribe or a] "recognized" tribe if (a) Congress or the Executive has created a reservation for the group by treaty, agreement, statute, executive order, or valid administrative action; and (b) the United States has had some continuing political relationship with the group.

*Mashpee Tribe v. Secretary of Interior,* 820 F.2d 480, 484 (1st Cir.1987) [citing F. Cohen, *Handbook of Federal Indian Law* at 6 (1982)]. The plaintiffs in the instant action meet the above-quoted test.

prisingly, the plaintiffs and the defendants maintain quite different positions on just how literally the language of the statute should be read.

The defendants contend that federal government consent to the alienation of tribal land, by ratification of a land conveyance, need not be in the form of an express federal treaty or convention made by the President with the consent of the Senate. Further, the defendants contend that ratification need not be explicit.

■ Addressing the second point first, the Supreme Court has unequivocally held that congressional intent to terminate title to Indian land must be plainly and unambiguously expressed. *Oneida County, N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 247–48, 105 S.Ct. 1245, 1258–59, 84 L.Ed.2d 169 (1985). It is difficult, if not impossible, for the court to envision instances where *implicit* federal government ratification will be plain and unambiguous. As held in *Oneida Indian Nation of New York v. County of Oneida*, "Termination of Congressional responsibility under the Nonintercourse Act must be explicit." 434 F.Supp. at 538. Further, Justice Brennan has stated, "[I]nterests in Indian lands can be conveyed only pursuant to explicit congressional authorization." (footnote omitted). *Mountain States Telephone & Telegraph Company v. Pueblo of Santa Ana*, 472 U.S. 237, 257–58, 105 S.Ct. 2587, 2599, 86 L.Ed.2d 168 (1985) (Brennan, J., joined by Marshall, J. and Blackmun, J., dissenting). The court is unwilling to accept the defendants' argument that implicit congressional ratification will satisfy the requirements of the Act.

As for the defendants' first point on this issue, stating that federal government ratification of a conveyance of Indian land must be plain and unambiguous, as well as explicit, does not necessarily answer the question of whether such ratification must be by express federal treaty. At least one court has held that any conveyance of Indian land must be by an express treaty or convention made by the President with the consent of the Senate. *Mashpee Tribe v. Watt*, 542 F.Supp. 797, 805 (D.Mass.1982), aff'd, 707 F.2d 23 (1st Cir.1983).

Further, the Supreme Court itself has touched upon this question. In *Oneida County, N.Y. v. Oneida Indian Nation of New York State*, the Court addressed the issue of ratification of conveyances of Indian land. Confronted with the argument that there was language in two different treaties, one entered into in 1798 and the other in 1802, that served to ratify conveyances that occurred in 1795, the Court held that neither treaty evidenced an intent by either the Senate or the President to ratify the conveyances. 470 U.S. at 248, 105 S.Ct. at 1259. The Court stated that the language in the treaties that purportedly served to ratify the conveyances was neither plain nor unambiguous. *Id.* Although it could have, however, the Court did not set down an unequivocal rule that any conveyance of Indian land must be by express federal treaty in order to comply with the Nonintercourse Act. Thus, the question of the form that ratification must take is, at least in this court's view, not completely settled.[4]

Arriving at the uncertain answer that a conveyance of Indian land *may* require a treaty made by the President with the consent of the Senate is not of tremendous assistance in resolving the issues before the court at this time. Although the parties are in vehement disagreement on the issue of whether ratification of the 1795 and 1807 conveyances occurred, they do not appear to disagree on the issue of whether the conveyances were accomplished by treaties made by the President with the consent of the Senate. Stated simply, the record is completely void of any indication that the President made the 1795 and 1807 treaties with the consent of the Senate.

4. The plaintiffs argue that ratification cannot occur subsequent to the conveyances. However, that the Supreme Court, in *Oneida County, N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985), was examining language in 1798 and 1802 treaties to determine if there was any ratification of conveyances that occurred in 1795 lends strong support to the defendants' position that ratification need not occur contemporaneously with the conveyances. *See id.* at 246–48, 105 S.Ct. at 1258–59.

Thus, if it is ultimately decided that such requirements must be met before a valid conveyance of Indian land can be made, then the plaintiffs have established a prima facie case of a violation of the Nonintercourse Act.

However, because the court, at least at the present time, is not completely convinced that there must always be an express federal treaty in order to validly convey Indian land, it deems it wise to determine if there were any acts or circumstances surrounding the conveyances that could lead to a finding of plain and unambiguous ratification.

■ Having said that, the court is constrained to note that the evidence that it has examined in this regard does not favor the defendants. The defendants point to the involvement of federal officers Israel Chapin and Jasper Parrish with the 1795 treaty and Jasper Parrish with the 1807 treaty. Further, the defendants argue that the 1838 Treaty of Buffalo Creek served to ratify the 1795 and 1807 conveyances. The plaintiffs make several cogent arguments as to why none of the circumstances surrounding the conveyances evidence ratification on the part of the federal government, and in *Oneida Indian Nation of New York v. County of Oneida*, the court discussed the specious nature of the argument regarding the Buffalo Creek Treaty. 434 F.Supp. at 538–40. What must be remembered at all times, and is worth repeating, is that ratification must be plain and unambiguous, as well as explicit.

The court is quite cognizant, though, that at this stage of the proceedings, its role is not to weigh the evidence, but to determine whether there are any genuine issues of material fact. The court concludes that the defendants have demonstrated the existence of open questions of material fact that should be resolved before a final determination in this action is reached. Particularly in a case with the wide-ranging ramifications of this one, the development of a complete factual record regarding the circumstances of the conveyances will serve to facilitate a more accurate, and thus, more just, resolution.

Additionally, although it perhaps does not directly rebut the establishment of a prima facie case of a Nonintercourse Act violation, the defendants have presented some support for an argument that the plaintiffs abandoned the land in question before the conveyances took place. *See Williams v. City of Chicago*, 242 U.S. 434, 37 S.Ct. 142, 61 L.Ed. 414 (1917); *United States v. Santa Fe Pacific Railroad Co.*, 314 U.S. 339, 354, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941). The plaintiffs' only response to this argument is that they did not raise this point in their motion for summary judgment and that it is inappropriately addressed at this time. Since both sides are moving for summary judgment, the court cannot imagine just what the appropriate time to address this defense might be. What the court can conclude at this time is that the defendants have sufficiently raised issues of material fact regarding alleged abandonment by the plaintiffs and that this issue cannot be resolved by summary judgment.

As for the plaintiffs' motion for partial summary judgment, then, the court reiterates its holding that the plaintiffs have met the first, second, and fourth requirements for the establishment of a prima facie case of a Nonintercourse Act violation. The court concludes, however, that further factual development is needed on the issues of ratification of the conveyances and the alleged abandonment by the plaintiffs of the land in question.

II.

The defendants' motions for summary judgment are premised on several grounds, which the court will attempt to address in order.

The defendants' initial point is that the plaintiffs are barred, by the doctrine of election of remedies, from pursuing their Nonintercourse Act action in this court. In 1906, the Cayuga Nation of New York petitioned the State of New York, in the form of what is known as a memorial, for additional consideration for the land conveyed in 1795 and 1807. In 1913, a settlement was reached for approximately $247,600,

and a trust was established by the State on behalf of the Cayuga Nation. According to the defendants, that trust had a principal of over $433,000 in 1972.

Further, in 1951, the Seneca-Cayuga Tribe of Oklahoma petitioned the Indian Claims Commission of the federal government (ICC or the Commission) for additional consideration for the 1795 and 1807 conveyances. In 1974, there was a trial on the liability issue which occurred after a lengthy litigation process that included an earlier trial and a remand by the United States Court of Claims. The ICC found in favor of the Seneca-Cayugas, and in 1975, a settlement was reached between that tribe and the federal government for just over $70,000. In 1977, the settlement was approved; in 1978, there was a final judgment incorporating the settlement; and in 1983, a fund distribution plan was approved by Congress. The defendants assert that each tribe has elected its remedy, and the plaintiffs cannot now come before this court for the proverbial "second bite of the apple." [5]

█ The doctrine of election of remedies is given little, if any, validity in federal practice; see *Carbone v. Gulf Oil Corp.*, 812 F.2d 1416, 1421 (T.E.C.A.1987); and under any circumstances is considered a harsh doctrine that is not favored. *Quinn v. DiGiulian*, 739 F.2d 637, 644 (D.C.Cir. 1984). In order to apply the doctrine, there must be: (1) the existence of two or more remedies; (2) the inconsistency of such remedies; and (3) a choice of one of them. *Davis v. Rockwell International Corp.*, 596 F.Supp. 780, 787 (N.D.Oh.1984).

█ What must not be lost sight of in this discussion is that any conveyance of land in contravention of the dictates of the Nonintercourse Act is invalid, as if it did not occur at all. Because either plaintiff tribe sought additional consideration for

the land, or even received such consideration, does not place an imprimatur of validity on the conveyances. The receipt of additional monies is of no bearing on the issue of whether there was compliance with the Act.

Therefore, even if the doctrine of election of remedies were generally accepted in federal practice, which it is not, the court concludes that it is inapplicable here. Neither plaintiff was afforded a true choice of remedies, as the receipt of additional consideration is no remedy at all for an invalid conveyance of land.[6] The court thus finds no merit to the defendants' argument based on the doctrine of election of remedies.[7]

█ The defendants' next argument is that the court lacks subject matter jurisdiction over this action, because the Indian Claims Commission provided the exclusive forum to resolve disputes regarding the validity of the conveyances. The ICC, which is no longer in existence, was created by Congress to resolve Indian claims against the United States. 25 U.S.C. § 70a *et seq.* There is no mention in the statute of the Commission having any jurisdiction to hear claims against non-federal parties.

In support of their argument, the defendants rely on three cases: *Oglala Sioux Tribe of the Pine Ridge Indian Reservation v. Homestake Mining Co.*, 722 F.2d 1407 (8th Cir.1983); *Oglala Sioux Tribe of the Pine Ridge Indian Reservation v. United States*, 650 F.2d 140 (8th Cir.1981); and *Navajo Tribe of Indians v. State of New Mexico*, No. 82–1148–JB, slip op. (D.N.M. Jan. 23, 1984), *aff'd*, 809 F.2d 1455 (10th Cir.1987). These cases differ from the instant one in several respects. Most notable, though, is that the defendants in all three cases were the United States and other parties that derived their title to the land in question directly from the United

---

**5.** This election of remedies argument, on which one group of defendants in particular devotes a great deal of energy, differs little from an argument based on res judicata.

**6.** The defendants do contend that the Indian Claims Commission was in a position to rule on the validity of the conveyances and in fact did

so, at least as to the 1807 conveyance. As will be discussed presently, this contention is not well taken.

**7.** Should the plaintiffs ultimately prevail on the issue of liability, that they received additional consideration for the land in question may become pertinent to the issue of damages.

States. Those facts prompted the courts to hold that the ICC was the exclusive forum for the resolution of the disputes and, in *Navajo Tribe of Indians v. State of New Mexico,* that the United States was an indispensable party. Slip op. at 6.

There is no question that, in the case *sub judice,* the defendants· did not derive title to the disputed land directly from the United States, and there is no basis upon which to hold that the United States is an indispensable party.[8] *See Oneida Indian Nation of New York v. County of Oneida,* 434 F.Supp. at 544–45. The court in that case also stated that:

> A more important question, whether the Indian Claims Commission was created to provide an exclusive remedy for redress of wrongs to the Indian nations, was not raised by the defendants but deserves comment.... The legislative history makes clear that the Commission was to consider only claims against the United States; no intent to supplant Indian claims against other parties, governmental or private, is evidenced.

434 F.Supp. at 531 n. 9.[9] The court therefore concludes that it does not lack subject matter jurisdiction over the instant action.

■■■ The defendants further assert in support of their motions for summary judgment that the proceedings before the Indian Claims Commission served to create a preclusive bar to the action in this court. There are two main doctrines of preclusion, res judicata and collateral estoppel.[10] Res judicata has been defined as follows:

> The principle of res judicata bars a subsequent suit between the same par-

ties or their privies where a prior action has resulted in a judgment on the merits of the same cause of action. Res judicata prevents the subsequent litigation of any defense or ground for recovery that was available to the parties in the original action, whether or not it was actually litigated or determined.

*Tucker v. Arthur Andersen & Co.,* 646 F.2d 721, 727 (2d Cir.1981); *see also National Association of Pharmaceutical Manufacturers v. Department of Health and Human Services,* 586 F. Supp. 740 (S.D.N.Y.1984). Clearly, none of the defendants in this district court action, nor their privies, were defendants in the ICC action.[11] Moreover, as the court has already concluded that the ICC was created to resolve claims against the United States, the plaintiffs could not have proceeded against non-federal defendants, at least not against those who did not derive title directly from the United States, in that forum. Therefore, res judicata does not serve as a bar to this federal court action.[12]

■■■ While res judicata involves claim preclusion, collateral estoppel involves issue preclusion:

> The doctrine of collateral estoppel ... normally will bar the relitigation of an issue of law or fact that was raised, litigated, and actually decided by a judgment in a prior proceeding between the parties, if the determination was essential to the judgment, regardless of whether or not the two proceedings are based on the same claim.

*N.L.R.B. v. United Technologies Corp.,* 706 F.2d 1254, 1260 (2d Cir.1983). Addi-

---

**8.** The United States has filed an amicus brief in this action on the issue of tribal status of the plaintiffs.

**9.** The defendants maintain that the court's statement regarding the congressional purposes in creating the Indian Claims Commission was "merely" dicta. Dicta or not, this court agrees with the statement.

**10.** The defendants at times indiscriminately mix the doctrines of res judicata and collateral estoppel.

**11.** The Cayuga Nation of New York also argues that it was not in privity with the Seneca-Cayuga Tribe of Oklahoma in the Indian Claims Com-

mission proceeding. The court concludes that there are open questions of fact in that regard, but that issue is irrelevant to the court's determination at this time.

**12.** The court also notes the existence of a statutory res judicata bar to Indian Claims Commission decisions. 25 U.S.C. § 70u(b); *United States v. Dann,* 706 F.2d 919, 923–25 (9th Cir. 1983), *rev'd on other grounds,* 470 U.S. 39, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985). However, as that bar applies only to claims against the United States, it has no bearing in the instant case.

tionally, similarity between the issues is not sufficient; the issues must be identical. *Shapley v. Nevada Board of State Prison Commissioners*, 766 F.2d 404, 408 (9th Cir. 1985).

The defendants maintain that because the ICC made some findings regarding the federal government's "involvement" with the 1795 and 1807 conveyances, the issue of federal ratification has already been decided. Regarding the 1795 treaty, the Commission merely found that the federal government had knowledge of New York State's intention to purchase land from the Cayugas and that the Cayugas complained to the federal government about the fairness of the treaty. *The Cayuga Nation of Indians v. United States*, Docket No. 343, 36 Ind.Cl.Comm. 75, 79 (1975). As for the 1807 treaty, the Commission found again that the federal government had knowledge of the treaty, and the Commission also found that a government representative was involved in the treaty negotiations and was present at the signing. *Id.* at 80.

The court has already held that the development of a full factual record regarding the circumstances of the conveyances is in order. The findings of the ICC may eventually have some pertinence in that regard. Those findings, however, standing alone, do not support the conclusion that there was plain, unambiguous, and explicit ratification of either the 1795 or 1807 conveyance. The issue of federal government ratification was not before the ICC. It was not raised; it was not litigated; and it was not essential to the ICC's decision. Thus, collateral estoppel does not bar this court's determination of the issue of federal government ratification of the conveyances.

Consequently, the court refuses to leapfrog to the next conclusion that the defendants would have it reach. The conclusion is that, because the 1807 treaty between the Cayugas and the State of New York has already been found "valid," then the 1795 treaty must be considered "valid" as well. The 1807 treaty has certainly not been found valid, and even if it were, the court is not convinced at this point in time that its validity would serve to automatically ratify the 1795 treaty.

The defendants' final contention in support of their motions is that, because the Indian Claims Commission was created by Congress, and because it resolved the claim of the Seneca-Cayuga Tribe of Oklahoma for additional consideration, it ratified the 1795 and 1807 land conveyances. The defendants have again lost sight of the fact that federal ratification must be plain, unambiguous, and explicit. An award by the Commission need not be based on a finding of validity of the conveyances themselves.[13] *See United States v. Oneida Nation of New York*, 576 F.2d 870, 882 n. 26 (Ct.Cl.1978). Even if such a presumption of validity could be made, the ratification by the Commission would be implicit, not explicit.

Further, that the Commission was created by Congress did not give it inherent ratification power. Such a contention was presented to the court in *Oneida Indian Nation of New York v. County of Oneida*, No. 79–7685 (N.D.N.Y. May 17, 1979). In refuting the contention, the court held that, had Congress wanted to provide the ICC with ratification power, it could have done so, but it did not.[14] Transcript at 74–97. The court agrees with that holding and finds no merit to the defendants' argument

---

13. As noted, the additional consideration received by the Seneca-Cayuga Tribe of Oklahoma was not so much by award as by settlement.

14. The Supreme Court has made clear that it will examine congressional intent quite carefully when interpreting statutes that allow for the alienation of Indian land. In *Mountain States Telephone & Telegraph v. Pueblo of Santa Ana*, 472 U.S. 237, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985), the Court had occasion to examine a statute that allowed for the alienation of Pueblo Indian land. That statute provides for approval by the Secretary of Interior. Notwithstanding that the remaining language in the statute is almost identical to that contained in the Nonintercourse Act, the Court noted that the difference between approval by the Secretary of Interior and ratification by Congress is "significant." *Id.* at 250–51, 105 S.Ct. at 2595–96.

regarding the ratification power of the Indian Claims Commission.

Accordingly, for the reasons adduced in this opinion, the plaintiffs' motion for partial summary judgment and the defendants' motions for summary judgment are denied. Further proceedings will be limited to the issues of federal government ratification and alleged abandonment by the plaintiff tribes as discussed herein.

IT IS SO ORDERED.