The CAYUGA INDIAN NATION OF NEW YORK, et al., Plaintiffs,

and

The Seneca–Cayuga Tribe of Oklahoma, Plaintiff–Intervenor,

v.

Mario M. CUOMO, et al., Defendants.

Nos. 80–CV–930, 80–CV–960.

United States District Court, N.D. New York.

Feb. 15, 1990.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, Ariz. (Glenn M. Feldman, of counsel), and Joseph, Gajarsa, McDermott & Reiner, Washington, D.C. (Arthur J. Gajarsa, of counsel), for plaintiffs and plaintiff-intervenor.

Robert Abrams, Atty. Gen. of State of N.Y., Albany, N.Y. (David B. Roberts, Asst. Atty. Gen., of counsel), for state defendants.

Huber, Lawrence & Abell, New York City (Howard M. Schmertz, of counsel), for defendant New York State Electric & Gas Corp.

Hiscock & Barclay, Syracuse, N.Y. (Richard K. Hughes, of counsel), for Consol. Rail.

Goodwin, Procter & Hoar, Boston, Mass. (Allan van Gestel, of counsel), for Counties of Cayuga and Seneca and Miller Brewing.

Wiles, Fahey & Lynch, Syracuse, N.Y. (Joseph E. Fahey, of counsel).

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

By this motion, the plaintiff Cayuga Indian Nation and the plaintiff-intervenor Seneca–Cayuga Tribe of Oklahoma (collectively referred to as "the plaintiffs" or "the Cayugas") seek a declaration that two conveyances of land, one occurring in 1795, and the other occurring in 1807, are invalid under the Nonintercourse Act (or "Act"), 25 U.S.C. § 177. The defendants oppose said motion, claiming that questions of fact exist concerning the circumstances surrounding these conveyances. For the reasons stated below, this court grants the plaintiffs' motion for partial summary judgment, and declares that the conveyances at issue were never properly ratified by the federal government as required by the Nonintercourse Act.

## BACKGROUND

This is the third memorandum-decision written by this court concerning the instant action, and familiarity with this case is presumed. See Cayuga Indian Nation of New York et al. v. Cuomo et al., 565 F.Supp. 1297 (N.D.N.Y.1983) ("Cayuga I"), Cayuga Indian Nation of New York et al. v. Cuomo et al., 667 F.Supp. 938 (N.D.N.Y. 1987) ("Cayuga II"). Nevertheless, a brief review of the facts surrounding this lawsuit is in order.

The plaintiffs' complaint seeks a declaration of their current ownership of and right to possess a tract of land in central New York State containing approximately 64,-

000 acres, an award of fair rental value for the almost two hundred years during which they have been out of possession of said land, and other monetary and protective relief.

This court has previously held that the plaintiffs can present evidence in support of the above claim, *see Cayuga I*, 565 F.Supp. at 1330, and in *Cayuga II* both parties' motions for summary judgment were denied. *Id.*, 667 F.Supp. at 949.

## DISCUSSION

The most recent pronouncement of the Nonintercourse Act, which has been in effect in various versions for nearly two hundred years, provides as follows:

§ 177. Purchases or grants of lands from Indians

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000. The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the approbation of the commissioner of the United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within

such State, which shall be extinguished by treaty.

25 U.S.C. § 177.

As stated in *Cayuga II*, to establish a violation of the Nonintercourse Act, a plaintiff must prove that: (1) it is or represents an Indian tribe within the meaning of the Act; (2) the parcels of land at issue are covered by the Act as tribal land; (3) the United States has never consented to the alienation of the tribal land; and (4) the trust relationship between the United States and the tribe has never been terminated.[1] *Cayuga II*, 667 F.Supp. at 941 and cases cited therein.

This court has found that the plaintiffs have, as a matter of law: (1) established for purposes of the Nonintercourse Act that they represent an Indian tribe within the meaning of the Act; (2) proven that the land in question is covered by the Act as tribal land, and (3) demonstrated that the requisite trust relationship concerning the fourth requirement of a Nonintercourse Act suit exists between the plaintiffs and the federal government. *Id.*, 667 F.Supp. at 943.

In that decision, it was noted that the factual record concerning the circumstances surrounding the 1795 and 1807 land conveyances was, at the time, incomplete. *Id.* at 945. Consequently, this court could not determine whether the United States had ever consented to the conveyances at issue, and both parties' motions for summary judgment were denied. *Id.* at 949.

Since that order, the parties have been afforded more than two years of additional discovery. Thus, this court is confident that the parties have had ample time to discover any and all relevant documents concerning these conveyances, and will now consider the merits of plaintiffs' contention that the United States never consented to either of these land conveyances.[2]

---

**1.** The Cayuga Indian Nation's members maintain that they are the direct successors in interest to the Cayuga Nation of the Six Nation Iroquois Confederacy which, until the acts complained of in this suit, occupied the land at issue since time immemorial. *Cayuga I*, 565 F.Supp. at 1302. The Six Nations in this Confederacy were comprised of the Oneida, Tuscarora, Mohawk, Onondaga, Cayuga and Seneca Nations. *Id.* at 1303.

**2.** The procedural posture of this case is readily distinguishable from the procedural history found in *Oneida Indian Nation of N.Y. v. State of New York*, 520 F.Supp. 1278 (N.D.N.Y.1981), *aff'd in part, rev'd in part* 691 F.2d 1070 (2d Cir.1982), *cert. denied* 474 U.S. 823, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985).

The district court in that case had taken judicial notice of correspondence, notes, and other historical evidence proffered by the parties as

For a treaty to be valid under the Nonintercourse Act, it must be (1) made in the presence of a federal treaty commissioner, and (2) entered into pursuant to the Constitution. *See* 25 U.S.C. § 177.

The plaintiffs assert that no federal treaty commissioners were present at either the 1795 or the 1807 land conveyances. Additionally, they claim that neither of these New York treaties were approved by the President with the advice and consent of the United States Senate, and therefore neither conveyance was entered into pursuant to the Constitution.

Defendants claim that federal treaty commissioners were present at the time of both land conveyances, and that the federal government ratified both of these treaties in a manner consistent with the Nonintercourse Act.

(1) The presence of federal treaty commissioners.

For a conveyance to be valid under the Nonintercourse Act, the sale must be made "in the presence and with the approbation of the commissioner of the United States to hold [treaties]." 25 U.S.C. § 177. Thus, the New York treaties could only be valid if they were made in the presence of a federal treaty commissioner.

The plaintiffs contend that there is no evidence that any such commissioner was present at the time of either of the two conveyances. The defendants argue that both Jasper Parrish and Israel Chapin Jr. were present at the time the agreements at issue were made, and that these individuals were official representatives of the United States.

In light of the differing views held by the parties concerning the role these men played with respect to these conveyances, this court, with the assistance of testimony from historians provided by both parties, has examined the actions taken by both Jasper Parrish and Israel Chapin, Jr., in order to determine whether either of these individuals, or both, were federal treaty commissioners at the time of the 1795 and 1807 conveyances.

(a) *Jasper Parish.*

At the time New York entered into the 1795 and 1807 treaties with the Cayugas, Jasper Parrish was an interpreter employed by the federal government. He was present at treaty negotiations in both 1795 and 1807, and signed the 1795 treaty between New York and the plaintiffs as a witness and as an interpreter in the federal service.[3]

On February 15, 1803, Parrish was appointed to the position of Indian sub-agent to the Six Nations.[4] On February 26, 1807, Parrish travelled with Cayuga representatives to a negotiation session in Albany, New York wherein New York agreed to purchase any remaining land-use rights the plaintiffs still possessed.[5] Parrish signed and witnessed the final 1807 agreement between the Cayugas and the defendants. Additionally, Parrish transmitted the consideration paid by New York State for the acquisition of the Cayuga land under the

---

an aid in interpreting the Articles of Confederation, the Proclamation of 1783, and the 1784 Fort Stanwix Treaty. *See generally Oneida Indian Nation of N.Y. v. State of New York* 520 F.Supp. at 1308–28.

In finding the exercise of judicial notice inappropriate under the circumstances, the Second Circuit noted that "when facts or opinions found in historical materials or secondary sources are disputed, it is error to accept the data (however authentic) as evidence." *Oneida Indian Nation,* 691 F.2d at 1086. The Second Circuit held that the opposing party in such situations should be afforded an opportunity to present information which might challenge the

facts or propriety of disputed historical data. *Id.*

In the instant case, this court has utilized affidavits of historians provided by both parties in interpreting various documents relevant to the present action. Thus, unlike in *Oneida Indian Nation,* the parties here have presented information they believe supports their interpretation of disputed historical data, and therefore this court may properly reach the merits of the plaintiffs' arguments.

**3.** Affidavit of Francis G. Hutchins, 11/17/89, "Hutchins Affidavit", ¶¶ 4(r), 4(s).

**4.** *Id.,* ¶ 4(t).

**5.** *Id.,* ¶ 4(cc).

1807 treaty.[6]

### (b) Israel Chapin Jr.

General Israel Chapin, Sr. was an appointed U.S. agent to the Six Nations and was specifically authorized by both the President and Secretary of War Timothy Pickering to facilitate negotiations between the Cayugas and New York State for the sale of the land at Cayuga Lake.[7] After Chapin Sr.'s death, Pickering appointed Israel Chapin Jr. to succeed his father as a U.S. Agent.[8]

In claiming that Chapin, Jr. had no authority to treat with the Indians on behalf of the federal government, the plaintiffs submit a letter written by Pickering to General Israel Chapin, Sr., which stated that "unless a commissioner of the U. States holds the [Buffalo Creek] treaty neither you nor Mr. Parish are to give any countenance to it."[9] The plaintiffs contend that this proves that Chapin Sr. was himself not a federal treaty commissioner.

As further support for this contention, the plaintiffs cite a letter Israel Chapin Jr. wrote to Pickering about the New York treaties. This letter stated that Chapin, Jr. had "supposed the Commissioners [present at the 1795 treaty] were fully authorized by the Government of the United States as well as that of their own with full powers to transact the business."[10]

While the plaintiffs contend that this is proof that Israel Chapin Jr. did not believe himself to be a federal treaty commissioner, the defendants proffer this letter as proof that Chapin Jr. assumed he was so authorized, and this letter was sent merely to confirm his beliefs.

Additionally, the defendants have proffered testimony which indicates that Israel Chapin Jr. was in attendance with the Cayugas at Cayuga lake as an official representative of the United States when the 1795 New York treaty was signed.[11] Further, Chapin's signature appears on the 1795 conveyance as the first among ten witnesses.[12]

Since there is conflicting testimony concerning whether Jasper Parrish or Israel Chapin, Jr. were officials representing the federal government at the time of the conveyances at issue, it would be inappropriate for the court, on a motion for summary judgment, to resolve this dispute in favor of the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Accordingly, for purposes of this motion, this court will assume that federal treaty commissioners were present at the time of the 1795 and 1807 conveyances.

(2) Federal ratification of the 1795 and 1807 conveyances.

The mere presence of federal treaty commissioners at treaty negotiations, or signatures of such individuals as witnesses to conveyances of land between New York State and the Cayugas, does not amount to federal ratification of treaties under the Nonintercourse Act. Rather, the United States must consent to the alienation of tribal land by way of a "treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177.

The parties in this action have widely differing interpretations of this portion of the Act. The plaintiffs maintain that the language "pursuant to the constitution" requires all Indian land conveyances be entered into in accordance with the treaty

---

**6.** *Id.,* ¶ 4(ee). While the defendants do not explicitly state that Parrish was a federal treaty commissioner, they do argue that, as a federal official, he was competent to treat with the Indians concerning the land conveyances at issue.

**7.** *Id.,* ¶ 4(j).

**8.** *Id.,* ¶ 4(k). The letter wherein Pickering appointed Chapin Jr. to this position stated: "[t]he public instruction formerly given to your father and which you will find among his papers, you will at present take for the general rule of your conduct." *Id.,* ¶ 4(*l*).

**9.** This letter is reproduced in plaintiffs' Reply Memorandum in support of their motion for partial summary judgment, "Plaintiffs' Reply Memorandum", at exhibit 1(c).

**10.** Hutchins Affidavit, ¶ 4(*o*).

**11.** *See id.,* ¶ 4(r).

**12.** *Id.,* ¶ 4(s).

making powers of the federal government as set forth in Article II, Section 2 of the Constitution. The defendants argue that the words in this statute are vague, and that the federal government may ratify an Indian treaty in any manner which demonstrates the federal government's clear and unambiguous consent to the conveyance.

In *Mashpee Tribe v. Watt*, 542 F.Supp. 797 (D.Mass.1982), *aff'd* 707 F.2d 23 (1st Cir.1983), *cert. denied* 464 U.S. 1020, 104 S.Ct. 555, 78 L.Ed.2d 728 (1983), the court, in discussing the requirements of the Nonintercourse Act, held that:

> [u]nder the Nonintercourse Acts, the restraint on alienation could be released only by treaty or convention. Treaties and conventions are made by the President with the advice and consent of the Senate.

*Id.* 542 F.Supp. at 805.

This interpretation of 25 U.S.C. § 177 was confirmed by the United States Supreme Court in *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985). In this case, the Supreme Court discussed, *inter alia*, the requirements of federal ratification of treaties under the Indian Trade and Intercourse Act.[13] The Court noted that all conveyances of Indian land under this Act were prohibited "except where such conveyances were entered into pursuant to the treaty power of the United States." *Id.* at 231–32, 105 S.Ct. at 1250.

Additionally, since this court's decision in *Cayuga II*, the plaintiffs have proffered evidence which demonstrates that Timothy Pickering, whom the defendants concede was "the senior federal official, under the President, in charge of Indian affairs",[14] unequivocally believed that ratification under the Nonintercourse Act required a treaty signed by the President with the advice and consent of the Senate.[15]

Therefore, at the present time, it is clear that the 1795 and 1807 land conveyances could only be valid if they were entered into pursuant to the treaty power of the United States. This power, found in Article II, Section 2 of the U.S. Constitution, provides that "[the President] shall have the power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur...." U.S. Const., Art. II, Sec. 2.

In discussing whether the defendants have provided this court with any evidence of such an express federal treaty, this court has already noted that:

> [a]lthough the parties are in vehement disagreement on the issue of whether ratification of the 1795 and 1807 conveyances occurred, they do not appear to disagree on the issue of whether the conveyances were accomplished by treaties made by the President with the consent of the Senate. Stated simply, the record is completely void of any indication that the president made the 1795 and 1807 treaties with the consent of the Senate. Thus, if it is ultimately decided that such requirements must be met before a valid conveyance of Indian land must be made, then the plaintiffs have established a prima facie case of a violation of the Nonintercourse Act.

*Cayuga II*, 667 F.Supp. at 944–45.

Two years later, the defendants have still failed to proffer any evidence of the federal government's express ratification of the 1795 and 1807 land conveyances.

Since there is no proof that the conveyances of 1795 and 1807 were ever ratified by the federal government in accordance with Article II, Section 2 of the U.S. Constitution, the plaintiffs are entitled to partial summary judgment on this theory alone. However, since the plaintiffs' motion could be granted under the defendants' interpre-

---

**13.** As the Supreme Court has noted, the Nonintercourse Act is "a stronger, more detailed version of the [Indian Trade and Intercourse] Act." *County of Oneida,* 470 U.S. at 232, 105 S.Ct. at 1250. Additionally, the non-alienability clauses found in both the Indian Trade and Intercourse Act and the Nonintercourse Act are substantially similar. *Cayuga I,* 565 F.Supp. at 1304.

**14.** Supplemental Affidavit of Francis G. Hutchins, 4/25/85, ¶ 4(d).

**15.** *See* letter from Timothy Pickering to John Jay, ¶ 2, reproduced in Plaintiffs' Reply Memorandum at exhibit 1(d).

tation of the Nonintercourse Act as well, this court will analyze their contention that the federal government plainly, unambiguously, and explicitly ratified the 1795 and 1807 New York treaties.

This court has previously held that, at a minimum, federal government ratification of a conveyance of Indian land must be plain, unambiguous, and explicit. *Cayuga II*, 667 F.Supp. at 944. In support of their claim that they have amply demonstrated federal ratification of the 1795 and 1807 conveyances, the defendants point to the correspondence of various figures from this country's past, including letters from former President George Washington, former Chief Justice of the U.S. Supreme Court John Jay, and former Secretary of War Timothy Pickering. The defendants also claim that the findings of the British–American Arbitral Tribunal demonstrates clear and unambiguous ratification of the 1795 and 1807 conveyances. Finally, the defendants argue that the 1838 Buffalo Creek Treaty ratified the 1795 and 1807 conveyances. These contentions will now be addressed *seriatim*.

(a) *Historical Correspondence.*

The defendants contend that federal ratification of the 1795 land conveyance is demonstrated in part by the fact that George Washington did not submit the 1795 document pertaining to this agreement to the United States Senate for ratification. In support of this theory, they proffer a letter sent by Washington to Timothy Pickering, wherein Washington states:

If the meeting of the Commissioners, appointed to treat with the ... Cayugas ... took place ... any further sentiment now on the unconstitutionality of the measure would be received too late. If it did not take place, according to expectation it is my desire that you would obtain the best advice you can on the case and do what prudence, with a due regard to the constitution and laws, shall dictate.[16]

As this letter indicates, Washington believed that he had either been contacted too late concerning his opinion about the constitutionality of the 1795 treaty, or that the parties involved should act with prudence and due regard to the U.S. Constitution and laws when arriving at an agreement.

President Washington believed that treaties entered into under what is now the Nonintercourse Act required " 'a public treaty, held under the authority of the United States.' " *Seneca Nation of Indians v. United States*, 173 Ct.Cl. 917, 923 (1965). Additionally, both sides agree that George Washington "adhered steadfastly to treaty formalities" when dealing with Indian nations.[17]

In light of these facts, this court is not persuaded that either the aforementioned letter, or Washington's refusal to submit the 1795 treaty to the Senate, is proof of plain, unambiguous, and explicit federal ratification of the 1795 conveyance.[18]

Defendants also contend that a letter from John Jay to Timothy Pickering is evidence of federal ratification of the agreements at issue. Jay, then Governor of New York, and Pickering had been debating the validity of the 1795 conveyance in light of the Indian Trade and Intercourse Act. In this letter, Jay states:

[w]hether the Constitution of the United States warrants the [Trade and Intercourse] act of Congress of the 1 March 1793, and whether the act of this State [i.e. New York] respecting the business now negotiating with the Onondaga and other tribes of Indians, is consistent with both or either of them, are questions which on this occasion I think I should forbear officially to consider and decide.[19]

---

**16.** Hutchins Affidavit, ¶ 4(v).

**17.** Defendants' memorandum in opposition to plaintiffs' motion for partial summary judgment, "Defendants' Memorandum", p. 4, Plaintiffs' Reply Memorandum, p. 8.

**18.** As the plaintiffs point out, the fact that Washington never submitted the document for Senate approval or formally proclaimed the treaty may be probative of the fact that Washington viewed the document as invalid and unworthy of further consideration. *See* Plaintiffs' Reply Memorandum, pp. 8–9, n. 4.

**19.** Hutchins Affidavit, ¶ 4(b).

The fact that Jay, who was not a federal official at the time he wrote the letter at issue, refused to officially consider whether the proposed treaty was consistent with the U.S. Constitution is clearly not proof of plain, unambiguous, and explicit federal ratification of the 1795 conveyance.

The defendants allege that federal consent to the 1795 conveyance is further evidenced by a letter sent by Timothy Pickering in his capacity as Secretary of War to George Clinton, then Governor of New York, on January 30, 1795. This letter, which was sent "[b]y the direction of the President of the United States", transmitted the Cayuga chiefs' request that New York State purchase the tribe's land-use rights.[20] The letter outlined the steps the chief believed should be taken by the State in acquiring the Cayuga's land.[21]

The defendants claim that since Pickering's letter did not qualify the procedure the Cayuga chief had outlined for the acquisition of the Cayuga land, Pickering, and therefore the federal government, had "[i]ntentionally or not ... given endorsement to the procedure outlined in the chiefs' request."[22] This position is untenable.

Clearly, an unintentional act on the part of Pickering would not be a plain, unambiguous, and explicit federal ratification of the 1795 conveyance. Additionally, numerous letters written by Pickering demonstrate that he believed that any treaty with the Cayugas would have to be formally ratified by Congress before a conveyance of tribal land would be valid under the Indian Trade and Intercourse Act.

For example, on June 29, 1795, Pickering wrote to Israel Chapin Sr., an agent to the Six Nations. In this letter, Pickering stated that the proposed treaty between New York State and certain tribes, including the Cayugas, would be "repugnant to the law of the United States."[23] Later that same year Pickering, on September 1, 1795, wrote a letter to then Governor John Jay. In describing what he believed to be the ratification requirements under the Indian Trade and Intercourse Act, Pickering stated:

> [Although] the cession of Indian land will be to the State, ... the instrument of cession is to be in the form of a treaty or convention, to be entered into "pursuant to the constitution;" *of course to be ratified by the President with the advice and consent of the Senate.* The State Commissioners negotiate only for the price (emphasis added).[24]

Thus, it is clear that Pickering believed that the proper procedure for federal ratification of an Indian treaty was an express treaty between the United States and the Indian tribe, ratified by the President with the advice and consent of the Senate. Defendants' contentions that Pickering believed otherwise are disproven by Pickering's own letters.

(b) *The British–American Arbitral Tribunal.*

The defendants also allege that findings of the British–American Arbitral Tribunal demonstrate federal ratification of the 1795 land conveyance.

On August 18, 1910, the United States and Great Britain, in an attempt to resolve certain claims which existed between the two governments, entered into an agreement which established an Arbitral Tribunal ("Tribunal").[25] Among the claims to be resolved by the Tribunal was a claim by Great Britain on behalf of the Cayuga Indians of Canada.

On January 22, 1926, the Tribunal published an award which required the government of the United States to pay Great

20. *Id.,* ¶ 4(i).

21. *Id.,* ¶¶ 4(i), 4(j).

22. Defendants' Memorandum, p. 9.

23. *See* letter from Timothy Pickering to Israel Chapin, Sr., reproduced in Plaintiffs' Reply Memorandum at exhibit 1(a).

24. This letter is reproduced in Plaintiffs' Reply Memorandum at exhibit 1(d).

25. Hutchins Affidavit, ¶ 4(mm).

Britain $100,000 as trustee for the Canadian Cayuga Indian tribe.[26] Later that year, President Coolidge, with the approval of both houses of Congress, included in the federal government's budget the funds required to pay Great Britain this award. The defendants argue that the payment of this award demonstrates the federal government's consent to the 1795 conveyance. However, any payments the federal government made pursuant to an arbitration award published more than one hundred and thirty years after the 1795 agreement at most constitutes an implicit ratification of the conveyance, and therefore is not evidence of a plain, unambiguous, and explicit ratification of the 1795 agreement.

The defendants also claim that "[t]he Arbitral Tribunal found unanimously that the 1795 Treaty was valid under pertinent federal law and that the federal government had knowledge of and responsibility to enforce the treaty's terms."[27] The Arbitral Tribunal cited by the defendants found that:

> [n]either in form nor in substance was the Treaty of 1795 a Federal Treaty; it was a contract of New York with respect to a matter as to which New York was fully competent to contract. In form it is exclusively a New York contract. The negotiators derived their authority from the State legislature and purported to represent the State only. The United States does not appear anywhere in the negotiations nor in the treaty. The United States Indian agent, who was present at the request of the Indians because they had confidence in him, appears as a witness in his personal, not his official, capacity.[28]

Since the Tribunal explicitly found that the treaty of 1795 was not a federal treaty in either form or substance, the defendants' contention that it found the convey-ance valid under pertinent federal law is without merit.

#### (c) *The Buffalo Creek Treaty of 1832.*

The defendants' final argument in opposition to the plaintiffs' motion for partial summary judgment is that the federal government ratified the 1795 and 1807 New York treaties through its ratification of the Buffalo Creek treaty in 1832. In this treaty, which was ratified by the Senate and signed by the President, several New York tribes, including the Cayugas, relinquished their rights to portions of land they had owned in Green Bay, Wisconsin.

Defendants point to two aspects concerning this treaty in support of their proposition that it retroactively ratified the 1795 and 1807 conveyances at issue. First, the defendants note that R.H. Gillett, a federal treaty commissioner, in describing the Cayuga Indian tribe to then Commissioner of Indian Affairs C.A. Harris, stated that the Cayugas were a tribe consisting of 130 individuals, and that "[m]any years since this tribe sold out all their lands, and gave the Senecas $800, for the privilege of residing on their reservations."[29] Additionally, the defendants note that Article 10 of the Buffalo Creek Treaty states that the Cayuga Indian tribe "agree[s] to remove from the State of New York to their new homes within five years and to continue to reside there."[30] The defendants contend that "in ratifying the Buffalo Creek Treaty, the President and the Senate explicitly approved the removal of the plaintiffs from New York State", and therefore, by analogy, the 1795 and 1807 treaties.

However, as with their arguments concerning the British–American Arbitral Tribunal, the events discussed by the defendants concerning the Buffalo Creek treaty at best demonstrate an implicit, rather than an explicit, approval of the 1795 and 1807 conveyances.

---

26. *Id.,* ¶ 4(pp).

27. Defendants' Memorandum, p. 16.

28. Nielsen, *American and British Claims Arbitration,* p. 326 (G.P.O.1926), reproduced in Plaintiffs' Reply Memorandum at exhibit "E".

29. *Hutchins Affidavit,* ¶ 4(jj).

30. Defendants' Memorandum, pp. 19–20.

Since this court has previously held that congressional ratification under the Nonintercourse Act must be explicit, and not implicit, *see Cayuga II*, 667 F.Supp. at 944, 945, the defendants' contention that the 1795 and 1807 conveyances were ratified by the subsequent ratification of the Buffalo Creek treaty is without merit.

In sum, none of the correspondence proffered by the defendants as proof of the federal government's alleged ratification of the 1795 and 1807 land conveyances demonstrates that the United States consented to these purported treaties in plain, unambiguous, and explicit terms. Additionally, evidence proffered by the defendants concerning the findings of the British–American Arbitral Tribunal, and the effect of the Buffalo Creek Treaty of 1832 is, at most, proof of an implicit ratification of the 1795 and 1807 agreements, and therefore insufficient to demonstrate explicit ratification of the conveyances, as would be required by the defendant's interpretation of the Nonintercourse Act.

### CONCLUSION

The defendants have been unable to establish a genuine issue of material fact concerning alleged ratification by the federal government of the 1795 and 1807 land conveyances at issue. There is no evidence before this court that the President, with the advice and consent of the Senate, ever ratified these conveyances by an express federal treaty. Additionally, the defendants have not proven that the circumstances surrounding the conveyances demonstrated a plain, unambiguous, and explicit ratification of the New York treaties by the United States government. For both of these reasons, this court grants the plaintiffs' motion for partial summary judgment.

IT IS SO ORDERED.