# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2003

(Argued: March 31, 2004

Decided: June 28, 2005
Errata Filed: July 8, 2005
2nd Errata Filed: July 18, 2005)

Docket Nos. 02-6111(L), 02-6130, 02-6140, 02-6200, 02-6211,
02-6219, 02-6301, 02-6131, 02-6151, 02-6309

CAYUGA INDIAN NATION OF NEW YORK,

*Plaintiff-Appellee-Cross-Appellant*,

SENECA-CAYUGA TRIBE OF OKLAHOMA,

*Plaintiff-Intervenor-Appellee-Cross-Appellant*,

UNITED STATES OF AMERICA,

*Plaintiff-Intervenor-Appellee,*

-v.-

GEORGE PATAKI, as Governor of the state
of New York, et al., CAYUGA COUNTY and
SENECA COUNTY, MILLER BREWING COMPANY, et al.,

*Defendants-Appellants-Cross-Appellees.*

Before: CABRANES and POOLER, *Circuit Judges*, and HALL, *District Judge.*[*]

Defendants appeal from a judgment of the United States District Court for the Northern District of New York (Neil P. McCurn, *Judge*) awarding tribal plaintiffs approximately $248 million in damages and prejudgment interest against the State for the late-eighteenth-century dispossession of their land, in violation of the Nonintercourse Act. 25 U.S.C. § 177. The tribal plaintiffs cross-

---

[*] The Honorable Janet C. Hall, of the United States District Court for the District of Connecticut, sitting by designation.

1

appeal from the award of prejudgment interest and the denial of the remedy of ejectment. The Supreme Court recently ruled in *City of Sherrill v. Oneida Indian Nation,* 125 S. Ct. 1478 (2005), that equitable doctrines, such as laches, acquiescence, and impossibility, can, in appropriate circumstances, be applied to Indian land claims. We understand the circumstances contemplated by *Sherrill* to include possessory land claims of the sort advanced here. We hold that plaintiffs' possessory land claim is subject to the defense of laches and conclude that the claim must be barred on that basis.

Reversed.

Judge Hall dissents in part and concurs in part in the judgment in a separate opinion.

MARTIN R. GOLD (Raymond J. Heslin, Robert P. Mulvey, *of counsel*), Sonnenschein Nath & Rosenthal, LLP, New York, NY, *for Cayuga Indian Nation of New York*

GLENN M. FELDMAN (Brian M. Mueller, *of counsel*), Mariscal, Weeks, McIntyre & Friedlander, P.A., Phoenix, AZ, *for Seneca-Cayuga Tribe of Oklahoma*

TODD S. KIM (Thomas L. Sansonetti, Assistant Attorney General, *on the brief*, Roger R. Martella, Jr., Hank Meshorer, Elizabeth A. Peterson, *of counsel*), U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., *for United States of America*

HOWARD L. ZWICKEL, Assistant Attorney General (Eliot Spitzer, Attorney General of the State of New York, *on the brief*; Caitlin J. Halligan, Peter H. Schiff, Andrew D. Bing, Sachin Pandya, Brian Kreiswirth, *of counsel*), Albany, NY, *for George E. Pataki, as Governor of the State of New York*

WILLIAM L. DORR (Daniel J. Moore, Brian Laudadio, Gregory J. McDonald, *of counsel*), Harris Beach LLP, Pittsford, NY, *for Cayuga County and Seneca County*

GUS P. COLDEBELLA (Anthony M. Feeherry, Mark S. Puzella, Brett C. Gerry, *of counsel*), Goodwin Procter LLP, Boston, MA, *for Miller Brewing Co. et al, Individually and as Representative of*

*the Defendant Class*

Carey R. Ramos (Jacqueline P. Rubin, *of counsel*), Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, *for amicus curiae Oneida of the Thames*

William W. Taylor, III (Michael R. Smith, Thomas B. Mason, David A. Reiser, *of counsel*), Zuckerman Spaeder LLP, Washington, D.C., *for amicus curiae Oneida Indian Nation of New York*

Arlinda F. Locklear (Lawrence S. Roberts, *of counsel*), Jefferson, MD, *for amicus curiae Oneida Tribe of Indians of Wisconsin*

Jeanne S. Whiteing (Tod Smith, *of counsel*), Whiteing & Smith, Boulder, CO, *for amicus curiae Seneca Nation of Indians of New York*

Don B. Miller, P.C., Boulder, CO, *for amicus curiae Stockbridge-Munsee Indian Community*

Hans Walker, Jr. (Marsha K. Schmidt, *of counsel*), Hobbs, Straus, Dean & Walker, LLP, Washington, D.C., *for amicus curiae St. Regis Mohawk Tribe*

Steven M. Tulberg (Alexandra C. Page, Andrew I. Huff, *of counsel*), Indian Law Resource Center, Washington, D.C., *for amicus curiae Tonawanda Band of Seneca Indians and Mohawk Nation*

José A. Cabranes, *Circuit Judge*:

We are here confronted by land claims of historic vintage—the wrongs alleged occurred over two hundred years ago, and this action is itself twenty-five years old—which we must adjudicate against a legal backdrop that has evolved since the District Court's rulings. The United States District Court for the Northern District of New York (Neil P. McCurn, *Judge*), determined (1) that treaties between the Cayuga Nation and the State of New York in 1795 and 1807 were not properly ratified by the federal government and were thus invalid under the Nonintercourse Act, 25 U.S.C. § 177; and (2)

3

that none of defendants' other arguments barred plaintiffs' suit. After ruling in plaintiffs' favor on liability, the District Court conducted a jury trial on damages, which resulted in a verdict for plaintiffs of approximately $36.9 million, representing the current fair market value of the land as well as fair rental value damages for 204 years. The District Court then concluded, following a month-long hearing, that plaintiffs were entitled to about $211 million in prejudgment interest, resulting in a total award of $247,911,999.42.

In another case raising land claims stemming from late-eighteenth-century treaties between Indian tribes and the State of New York, the Supreme Court recently ruled that equitable doctrines—such as laches, acquiescence, and impossibility—can be applied to Indian land claims in appropriate circumstances. *See City of Sherrill v. Oneida Indian Nation,* 125 S. Ct. 1478, 1494 (2005). Based on *Sherrill,* we conclude that the possessory land claim alleged here is the type of claim to which a laches defense can be applied. Taking into account the considerations identified by the Supreme Court in *Sherrill* and the findings of the District Court in the remedy stages of this case, we further conclude that plaintiffs' claim is barred by laches. Accordingly, we reverse the judgment of the District Court and enter judgment for defendants.

## BACKGROUND

Because of the disposition we reach here, we need not describe in great detail the long history of relations between the Cayuga Nation and the State of New York. We set forth below a concise description of the events underlying this lawsuit, as well as a more extended recounting of the case's procedural history.

### 1. Historical Background

Plaintiffs allege that from time immemorial until the late eighteenth century the Cayuga Nation owned and occupied approximately three million acres of land in what is now New York State, a

swath of land approximately fifty miles wide that runs from Lake Ontario to the Pennsylvania border. This action involves 64,015 acres of that land, encompassing the Cayuga's "Original Reservation," as set forth in a treaty with the State of New York, concluded on February 25, 1789 ("1789 Treaty"). In the 1789 Treaty, the Cayugas ceded all of their lands to New York, except the lands designated as the "Original Reservation," which consists of lands on the eastern and western shores of the northern end of Cayuga Lake.

Congress passed the first Indian Trade and Intercourse Act, known as the "Nonintercourse Act," in 1790, pursuant to Congress's power under Article I, Section 8, clause 3 of the Constitution, which gives Congress the power "to regulate Commerce . . . with the Indian Tribes." Act of July 22, 1790, ch. 33, § 4, 1 Stat. 137, 138. As the Supreme Court described it, "the Act bars sales of tribal land without the acquiescence of the Federal Government." *Sherrill*, 125 S. Ct. at 1484. Successive versions of the Act have been continuously in force from that time to the present day. *See* Rev. Stat. § 2116, 25 U.S.C. § 177.

On November 11, 1794, the Six Iroquois Nations[1] entered the Treaty of Canandaigua with the United States. 7 Stat. 44. This treaty acknowledged the Original Reservation the Cayugas retained in the 1789 treaty with New York, and promised the Cayugas that the land would remain theirs until they "chose to sell the same to the people of the United States who have the right to purchase." *Id.* art. II, 7 Stat. at 45. On June 16, 1795, William Bradford, then Attorney General of the United States, issued an opinion concluding that, under the 1793 version of the Nonintercourse Act, no Indian land sale was valid, nor could the land claims of the Six Iroquois Nations be extinguished, except pursuant to a treaty entered into by the Federal Government. *See Cayuga Indian Nation v. Cuomo*, 565 F. Supp. 1297, 1305 (N.D.N.Y. 1983) ("*Cayuga I*").

---

[1] This Confederation included the Cayugas, the Oneidas, the Mohawks, the Senecas, the Onondagas, and the Tuscaroras. *Cayuga Indian Nation v. Cuomo*, 565 F. Supp. 1297, 1303 (N.D.N.Y. 1983) .

On July 27, 1795, the Cayuga entered into a treaty with the State of New York in which the State acquired the entire Original Reservation of the Cayugas (except for a three-square-mile-area on the eastern shore of Cayuga Lake) in exchange for a promise that the State pay the Cayuga Nation $1,800 annually in perpetuity. *Id.* Although there is some debate about whether a federal official who signed the treaty as a witness was acting in a personal or official capacity, *id.*, it is undisputed that this treaty was never explicitly ratified by a treaty of the Federal Government. In 1807, the State of New York purchased the Cayugas' remaining three-square-mile-parcel for $4,800. *Id.* Again, the Federal Government never explicitly ratified this treaty.[2]

### 2. Procedural History - Liability Phase

Many years later, on November 19, 1980, the Tribe filed its complaint in this action, alleging these facts and requesting that the Court "[d]eclare that plaintiffs are the owners of and have the legal and equitable title and the right of possession" to all of the land in the Original Reservation and that the Court "[r]estore plaintiffs to immediate possession of all portions of the subject land claimed by any defendant or member of the defendant class and eject any defendant claiming their chain of title through the 1795 and 1807 New York State 'treaties.'" Plaintiffs also sought: (1) an accounting of all tax funds paid by possessors of the lands; (2) trespass damages in the amount of the fair rental value of the land for the entire period of plaintiffs' dispossession; (3) all proceeds derived in the future in connection with the removal or extraction of any natural resources to be placed in a trust fund for plaintiffs' benefit; (4) the costs of the action and attorneys' fees; and (5) "such other and further relief as the Court deems just."

Soon after filing the action, plaintiffs moved to certify a defendant class of landowners under

---

[2] Defendants claim that the 1838 treaty of Buffalo Creek effectively ratified these treaties. Although we ultimately need not reach this question, we note that, whatever it may do, the Treaty of Buffalo Creek neither mentions Cayuga land or Cayuga title in New York, nor refers to the 1795 or 1807 treaties. *See* Treaty of Jan. 15, 1838, 7 Stat. 550.

6

Federal Rule of Civil Procedure 23(b)(1)(B). The District Court certified a defendant class with respect to liability and named defendant Miller Brewing Company as representative of the defendant class. In 1981, the Seneca-Cayuga Tribe of Oklahoma was granted leave to intervene as plaintiff-intervenor and filed a complaint in intervention that was in pertinent respects identical to the original complaint filed by the Cayuga Nation of New York.

Defendants moved to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). After the District Court denied the motion to dismiss, and defendants filed their answer to the complaint, plaintiffs moved for partial summary judgment, asking the Court to find the 1795 and 1807 treaties invalid under the Nonintercourse Act and federal common law and to determine that plaintiffs were the current owners of the lands in question. The District Court found that plaintiffs constituted "Indian tribes" and that they were entitled to sue under the Nonintercourse Act, but held that it could not rule on whether the United States ratified the treaties as the record was not yet complete. *Cayuga Indian Nation v. Cuomo*, 667 F. Supp. 938, 942-43, 948 (N.D.N.Y. 1987) ("*Cayuga II*") The District Court also rejected defendants' arguments that the suit was barred by various doctrines, including election of remedies, res judicata, and collateral estoppel. *Id.* at 946-48.

After further discovery, plaintiffs again moved for partial summary judgment, asking that the Court find that the treaties had not been properly ratified. The District Court concluded that the Nonintercourse Act requires of any land-conveyance treaty with an Indian tribe (1) the presence of federal treaty commissioners at the signing of the treaty and (2) ratification, pursuant to the Treaty Clause of the U.S. Constitution. *Cayuga Indian Nation v. Cuomo*, 730 F. Supp. 485, 487 (N.D.N.Y. 1990) ("*Cayuga III*"). The Court granted plaintiffs partial summary judgment on this issue, concluding that there was no evidence that the treaties had been ratified pursuant to the Treaty Clause. *Id.* at 493.

7

In separate opinions in 1991, the District Court rejected defendants' remaining defenses of abandonment and laches. *Cayuga Indian Nation v. Cuomo*, 758 F. Supp. 107 (N.D.N.Y. 1991) ("*Cayuga IV*"); *Cayuga Indian Nation v. Cuomo*, 771 F. Supp. 19 (N.D.N.Y. 1991) ("*Cayuga V*"). The Court determined that the "1794 Treaty of Canandaigua conferred recognized title to the Cayugas concerning the land at issue" and that "proof of the plaintiffs' physical abandonment of the property at issue is irrelevant in a claim for land based upon reserved title to Indian land, for such title can only be extinguished by an act of Congress." *Cayuga IV*, 758 F. Supp. at 118. With regard to laches, the District Court concluded that Second Circuit precedent was clear that "claims brought by Indian tribes in general, including the plaintiffs herein, should be held by courts to be timely, and therefore not barred by laches, if, at the very least, such a suit would have been timely if the same had been brought by the United States." *Cayuga V*, 771 F. Supp. at 22 (citing *Oneida Indian Nation v. Oneida County*, 719 F.2d 525, 538 (2d Cir. 1983)). The Court thus found plaintiffs' action timely. *Id.* at 24.

Following these rulings, the District Court granted partial summary judgment on liability to plaintiffs against all defendants except the State of New York, which was excluded because it had asserted a new Eleventh Amendment defense based on the then-recent Supreme Court decision in *Blatchford v. Native Village of Noatak*, 501 U.S. 775 (1991). *Cayuga V*, 771 F. Supp. at 21 n.2, 24. The other defendants then moved to dismiss on the grounds that the State was an indispensable party.

In response to the State's Eleventh Amendment motion, the United States moved to intervene in the lawsuit on behalf of itself and on behalf of plaintiffs. The complaint-in-intervention sought a declaration that plaintiffs were entitled to possession of the land, ejectment of the current residents, and damages and interest. The motion to intervene was granted in November 1992.

After a stay of the proceedings for settlement discussions that lasted over three years, the District Court concluded that the State was entitled to Eleventh Amendment immunity, but that its

8

officials could be sued for prospective relief. The Court denied the non-State defendants' motion to dismiss, rejecting their contention that the State was an indispensable party. Having ruled on all liability issues, the Court noted that it "anticipate[d] receiving an application for certification of an interlocutory appeal." Defendants decided not to seek an interlocutory appeal.

### 3. Procedural History - Damages Phase

After the ruling for plaintiffs on all liability issues, a number of questions remained to be decided at the damages phase. Defendants argued (1) that ejectment was not a proper remedy in the case; (2) that plaintiffs should not be able to obtain prejudgment interest against the State; (3) that damages should be limited to the loss suffered by the Cayugas at the time of the treaties, as measured by the difference between the value received by the Cayugas and the fair market value of the lands at that time; (4) that the lands should be valued as a single 64,000-acre tract rather than as smaller, individual tracts; and (5) that damages should be based on a single valuation date of July 27, 1795.

The District Court issued a series of rulings in 1999 to resolve these and other issues relating to the damages proceedings. First, the District Court agreed with defendants that the land should be valued as a single parcel ("4" above) and that damages should be determined by reference to the value of the land on July 27, 1795 ("5" above). *Cayuga Indian Nation v. Pataki*, No. 80-CIV-930, 1999 U.S. Dist. LEXIS 5228, at *18-19 (N.D.N.Y. Apr. 15, 1999) ("*Cayuga VIII*"). In that same ruling, the Court found that plaintiffs' potential damages consisted of damages at the time of the Treaties and the fair rental value of the Cayugas' loss of use and possession of the land for the years of dispossesion, known as "mesne profits." *Id.* at *51-53. The Court determined that the award of prejudgment interest was an issue for the Court, and not for the jury, and that the Court would decide issues related to interest once the record had been further developed. *Id.* at *60-75 & n.35.

The Court next decided, on July 1, 1999, fully nineteen years after the filing of the complaint

seeking "immediate possession" of the land, that ejectment was not a proper remedy. *Cayuga Indian Nation v. Cuomo*, No. 80-CIV-930, 1999 U.S. Dist. LEXIS 10579, at *97 (N.D.N.Y. July 1, 1999) ("*Cayuga X*"). The Court found that "monetary damages will produce results which are as satisfactory to the Cayugas as those which they could properly derive from ejectment." *Id.* at *79. Because ejectment was the only relief plaintiffs were seeking against the individual State defendants, the Court dismissed the claims against those defendants. *Id.* at *99.

On October 8, 1999, the District Court ruled that the State of New York "could be deemed an original or primary tortfeasor." *Cayuga Indian Nation v. Pataki*, 79 F. Supp. 2d 66, 74 (N.D.N.Y. 1999) ("*Cayuga XI*"). Consequently, the Court determined that "a single trial against the State of New York as the sole defendant is the only practical way to proceed here." *Id.* at 77. As a result, the remedial proceedings held in the District Court and discussed below pertain only to the State as defendant.

The Court further ruled, on December 23, 1999, that it would not allow testimony related to equitable issues to be presented to the jury and that all equitable issues would be reserved to the Court. *Cayuga Indian Nation v. Pataki*, 79 F. Supp. 2d 78, 92 (N.D.N.Y. 1999) ("*Cayuga XII*"). The Court decided that, because it had rejected ejectment as an available remedy, it would allow evidence of current fair market value as a proper measure of damages. *Id.* at 94. As a result of these rulings, the District Court bifurcated the proceedings into (1) a jury trial to determine current fair market value and rental damages and (2) a subsequent hearing on prejudgment interest and other equitable issues.

A jury trial was held from January 18, 2000 through February 17, 2000. The parties' experts presented widely disparate estimates of the measure of plaintiffs' damages. The jury was presented with a Special Verdict Form that asked for a calculation of current fair market value of the subject land and for a year-by-year breakdown of rental damages from 1795 to 1999. The jury was instructed not to adjust rental damages to current day value, as all adjustments would be performed later by the

Court. On February 17, 2000, the jury returned a verdict finding current fair market value damages of $35 million and total fair rental value damages of $3.5 million. In awarding the fair rental value damages, the jury awarded the same rental value damages for each year from 1795 to 1999, in the amount of $17,156.86. The jury gave the State a credit for the payments it had made to the Cayugas, of about $1.6 million, leaving the total damages at this stage at approximately $36.9 million.

The hearing on prejudgment interest and other equitable issues was held from July 17, 2000 through August 18, 2000. Eight expert witnesses testified, regarding both the historical context and the assessment of prejudgment interest. Unsurprisingly, the experts reached substantially divergent estimates of the prejudgment interest to which the Cayugas were entitled, ranging from approximately $1.75 billion to zero (this counterintuitive calculation was based on the assumption that the jury verdict needed to be "adjusted" because the jury had expressed its verdict in "constant 2000 dollars").[3]

On October 2, 2001, the District Court issued a Memorandum-Decision and Order on the interest issue. *Cayuga Indian Nation v. Pataki*, 165 F. Supp. 2d 266 (N.D.N.Y. 2001) (*"Cayuga XVI"*). The District Court rejected both the "lowball" figure of the State's expert and the stratospheric figure of the plaintiffs' expert and relied on the estimate of the United States's expert, who had arrived at a figure of $529,377,082. *Id.* at 364. In doing so, the District Court took into account a number of equitable considerations, including "(1) the passage of 204 years; (2) the failure of the U.S. to intervene or to seek to protect the Cayuga's interests prior to 1992; (3) the lack of fraudulent or calculated purposeful intent on the part of the State to deprive the Cayuga of fair compensation for the lands ceded by them in the 1795 and 1807 treaties; and (4) the financial factors enumerated by [the State's expert]." *Id.* at 366. The District Court noted that these financial factors encompassed a number of considerations, including the question whether the Cayugas had access to financial markets or "the

---

[3] The expert actually testified that the Cayugas owed the State approximately $7.6 million, though the State assured the Court that it would not attempt to collect from the Cayugas.

ability, knowledge, or skills to take advantage of such markets, especially in the early years," the failure of the verdict to take into account the Cayugas' expenses over the past 204 years, the fact that the unimproved claim area had no rental value until the twentieth century, and the fact that compounding interest over 204 years is at best "a theoretical exercise," because it ignores the history of banking in this country and is extremely unlikely to occur in a real-world market. *Id.* at 364. In light of all these factors, the District Court adjusted downward the interest estimate by 60 percent, resulting in a prejudgment interest award of $211,000,326.80 and a total award of $247,911,999.42. *Id.* at 366. The District Court entered judgment that day.

The District Court addressed various post-judgment motions on March 11, 2002. *Cayuga Indian Nation v. Pataki*, 188 F. Supp. 2d 223 (N.D.N.Y. 2002) (*"Cayuga XVII"*). The Court first denied the State's motions for judgment as a matter of law and for a new trial. *Id.* at 247-48. The Court granted the State's motion "to amend the judgment to provide that it runs jointly in favor of the U.S., as trustee, and the tribal plaintiffs," but denied the State's motion "to amend the judgment to run exclusively in favor of the U.S." *Id.* at 257. Finally, the Court denied both parties' motions for recalculation of the prejudgment interest and plaintiffs' motion for reconsideration of the Court's earlier decision rejecting ejectment as a remedy. *Id.*

On June 17, 2002, the District Court granted the parties' motions for permission to appeal and certified for appeal, pursuant to 28 U.S.C. § 1292(b), the issues related to liability and remedies. We granted the District Court's certification of issues for immediate appellate resolution on December 11, 2002.

## DISCUSSION

The Supreme Court's recent decision in *City of Sherrill v. Oneida Indian Nation,* 125 S. Ct. 1478 (2005), has dramatically altered the legal landscape against which we consider plaintiffs' claims. *Sherrill*

12

concerned claims by the Oneida Indian Nation, another of the Six Iroquois Nations, that its "acquisition of fee title to discrete parcels of historic reservation land revived the Oneidas' ancient sovereignty piecemeal over each parcel" and that, consequently, the Tribe need not pay property taxes to the City of Sherrill. *Id.* at 1483. The Supreme Court rejected this claim, concluding that "the Tribe cannot unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue." *Id.*

We understand *Sherrill* to hold that equitable doctrines, such as laches, acquiescence, and impossibility, can, in appropriate circumstances, be applied to Indian land claims, even when such a claim is legally viable and within the statute of limitations. *See, e.g., id.* at 1494 ("[T]he distance from 1805 to the present day, the Oneidas' long delay in seeking equitable relief against New York or its local units, and developments in the city of Sherrill spanning several generations, evoke the doctrines of laches, acquiescence, and impossibility, and render inequitable the piecemeal shift in governance this suit seeks unilaterally to initiate."). *Sherrill* clarified that the decision does not "disturb" the Supreme Court's holding in *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 229-30 (1985) (*"Oneida II"*), which allowed Indian Tribes to seek fair rental value damages for violation of their possessory rights following an ancient dispossession. *See Sherrill,* 125 S. Ct. at 1494 ("In sum, the question of damages for the Tribe's ancient dispossession is not at issue in this case, and we therefore do not disturb our holding in *Oneida II*."). Because the Supreme Court in *Oneida II* expressly declined to decide whether laches would apply to such claims, *see Oneida II*, 470 U.S. at 244-45, 253 n.27, this statement in *Sherrill* is not dispositive of whether laches would apply here.

The Court's characterizations of the Oneidas' attempt to regain sovereignty over their land indicate that what concerned the Court was the disruptive nature of the claim itself. *See id.* at 1483 ("[W]e decline to project redress for the Tribe into the present and future, thereby disrupting the governance of central New York's counties and towns."); *id.* at 1491 ("This long lapse of time, during

13

which the Oneidas did not seek to revive their sovereign control through equitable relief in court, and the attendant dramatic changes in the character of the properties, preclude [the Tribe] from gaining the disruptive remedy it now seeks."); *id.* at 1491 n.11 ("[The Oneidas'] claim concerns grave, but ancient, wrongs, and the relief available must be commensurate with that historical reality."). Although we recognize that the Supreme Court did not identify a formal standard for assessing when these equitable defenses apply, the broadness of the Supreme Court's statements indicates to us that *Sherrill*'s holding is not narrowly limited to claims identical to that brought by the Oneidas, seeking a revival of sovereignty, but rather, that these equitable defenses apply to "disruptive" Indian land claims more generally.

In their post-*Sherrill* briefs, both the Cayugas and the United States maintain that the *Sherrill* decision "does not affect the award of monetary damages," Cayuga Letter Br. at 1, and "concerned particular equitable remedies" which are not at issue here as "the district court confined its judgment to an award of damages." United States Letter Br. at 6. Our reading of *Sherrill* suggests that these assertions do not present an entirely accurate assessment of its effect on the present case. While the equitable remedy sought in *Sherrill*—a reinstatement of Tribal sovereignty—is not at issue here, this case involves comparably disruptive claims, and other, comparable remedies *are* in fact at issue.

Despite the eventual award by the District Court of monetary damages, we emphasize that plaintiffs' claim is and has always been one sounding in ejectment; plaintiffs have asserted a continuing right to immediate possession as the basis of all of their claims, and have always sought ejectment of the current landowners as their preferred form of relief. As noted above, in their complaint in this case the Cayugas seek "immediate possession" of the land in question and ejectment of the current residents. Indeed, the District Court noted early in the litigation that it was "clear" that the complaint "presents a possessory claim, basically in ejectment." *Cayuga I*, 565 F. Supp. at 1317 (internal quotation

14

marks omitted).[4] Plaintiffs continue to maintain, on appeal in this Court, that ejectment is their preferred remedy. It was not until 1999, nineteen years after the complaint was filed, and eight years after the District Court's decision on liability, that the District Court determined that the ejectment remedy sought by the Cayugas was, "to put it mildly, . . . not an appropriate remedy in this case." *Cayuga X*, 1999 U.S. Dist. LEXIS 10579, at *97. The District Court thus effectively "monetized" the ejectment remedy in concluding that "monetary damages will produce results which are as satisfactory to the Cayugas as those which they could properly derive from ejectment." *Id.* at *79.

The nature of the claim as a "possessory claim," as characterized by the District Court, underscores our decision to treat this claim like the tribal sovereignty claims in *Sherrill.* Under the *Sherrill* formulation, this type of possessory land claim—seeking possession of a large swath of central New York State and the ejectment of tens of thousands of landowners—is indisputably disruptive. Indeed, this disruptiveness is inherent in the claim itself—which asks this Court to overturn years of settled land ownership—rather than an element of any particular remedy which would flow from the possessory land claim. Accordingly, we conclude that possessory land claims of this type are subject to the equitable considerations discussed in *Sherrill.*

This conclusion is reinforced by the fact that the *Sherrill* opinion does not limit application of these equitable defenses to claims seeking equitable relief. We recognize that ejectment has been characterized as an action at law, as opposed to an action in equity. *See, e.g., New York v. White*, 528 F.2d 336, 338 (2d Cir. 1975) (discussing "the legal remedy of ejectment"); *but see Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (stating in dicta that "[o]ur cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific

---

[4] Plaintiffs took the position in the District Court that monetary damages would not adequately compensate them for two hundred years of wrongful occupation. *See Cayuga VIII*, 1999 U.S. Dist. LEXIS 5228, at *5.

15

relief —which may include an order providing for . . . ejectment from land . . . .”). Plaintiffs urge us to

conclude that, as a legal remedy, ejectment is not subject to equitable defenses, relying, *inter alia*, on the

Supreme Court’s statement in *Oneida II* that “application of the equitable defense of laches in an

action at law would be novel indeed.” *Oneida II*, 470 U.S. at 244 n.16. In response to this claim, we

note *Sherrill*’s that “[n]o similar novelty exists when the specific relief [the Tribe] seeks would project

redress . . . into the present and future.” 125 S. Ct. at 1494 n.14. Whether characterized as an action at

law or in equity, any remedy flowing from this possessory land claim, which would call into question

title to over 60,000 acres of land in upstate New York, can only be understood as a remedy that would

similarly “project redress into the present and future.”[5]

One of the few incontestable propositions about this unusually complex and confusing area of

law is that doctrines and categorizations applicable in other areas do not translate neatly to these

claims. *See, e.g., Oneida II*, 470 U.S. at 240-44 (holding that the general law favoring the borrowing of

state law limitations-periods does not apply to federal Indian land claims); *Mohegan Tribe v. Connecticut*,

638 F.2d 612, 614-15 & n.3 (2d Cir. 1980) (holding that adverse possession does not run against

Indian land). This proposition was well stated by the District Court:

> As the parties are well aware, the Cayugas are seeking to enforce a “federal common
> law” right of action for violation of their possessory property rights, as well as
> seeking to vindicate their rights under the Nonintercourse Act. Unfortunately, that

---

[5] We note that even though ejectment has traditionally been considered an action at law, numerous jurisdictions have recognized the applicability of equitable defenses, including laches, in an action for ejectment based on a claim of legal title or prior possession, regardless of whether damages or an order of possession was sought. *See, e.g., Pankins v. Jackson*, 891 S.W.2d 845, 848 (Mo. Ct. App. 1995) (noting that ejectment is claim of legal right of possession, considering whether laches “defeated” “plaintiff’s right of possession,” and concluding it did not because the delay was not the fault of plaintiff and defendants were not prejudiced); *Jansen v. Clayton*, 816 S.W.2d 49, 51-52 (Tenn. Ct. App. 1991) (upholding dismissal of ejectment action because of laches and noting that “[a]lthough ejectment is an action at law, equitable defenses may bar purely legal claims”); *McRorie v. Query*, 232 S.E.2d 312, 319 (N.C. Ct. App. 1977) (“[Plaintiffs] contend that the defense of laches is not applicable here because this is an action in ejectment. They cite no authority for this position, and we find none.”); *Miller v. Siwicki*, 134 N.E.2d 321, 323 (Ill. 1956) (holding laches barred ejectment action brought after 22-year delay and specifying that laches, “even though an equitable defense, can be interposed in an ejectment action.”); *Olson v. Williams*, 151 N.W. 1043, 1044-45 (Mich. 1915) (enjoining pending ejectment action because barred by laches); *Loomis v. Rosenthal*, 57 P. 55, 61 (Or. 1899) (holding that plaintiffs’ “laches [was] so gross as to preclude their recovery of the land.”) .

16

> Act is silent as to remedies, thus leaving courts to resort to the common law as a means of "assisting . . . in formulating a statutory [Nonintercourse Act] damage remedy." Therefore, in molding a remedy in the present case and in structuring a manageable trial, in the court's opinion it may well be appropriate, and indeed necessary, to fashion a federal common law remedy, which although having some resemblance to remedies available for common law torts such as trespass, is a remedy uniquely tailored to fit the needs of this unparalleled land claim litigation. As the discussion below demonstrates, however, and has been evident for some time as the issue of remedies has come to dominate this litigation, common law principles, whether tort-based or not, are not readily transferrable to this action.

*Cayuga XI*, 79 F. Supp. 2d at 70-71 (internal citations, quotations, and emphasis omitted). In light of the unusual considerations at play in this area of the law, and our agreement that ordinary common law principles are indeed "not readily transferrable to this action," we see no reason why the equitable principles identified by the Supreme Court in *Sherrill* should not apply to this case, whether or not it could be technically classified as an action at law.

Thus, whatever the state of the law in this area before *Sherrill*, *see Oneida II*, 470 U.S. at 253 n.27 (reserving "the question whether equitable considerations should limit the relief available" in these cases); *id.* at 244-45 (deciding not to reach the question of laches because defendants had waived it), we conclude, for the above-stated reasons, that, after *Sherrill*, equitable defenses apply to possessory land claims of this type.

Our reading is not in conflict with the Supreme Court's decision in *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661 (1974) (*"Oneida I"*), where the Court specifically found federal jurisdiction to hear such possessory claims, including those in ejectment. *Id.* at 666. The Court there noted that "the complaint in this case asserts a present right to possession under federal law. The claim may fail at a later stage for a variety of reasons; but for jurisdictional purposes, this is not a case where the underlying right or obligation arises only under state law and federal law is merely alleged as a barrier to its effectuation." *Id.* at 675. The holding of *Sherrill* thus addresses the question reserved in *Oneida II* and follows from *Oneida I*'s holding by providing that these possessory claims are subject to

equitable defenses.

Inasmuch as the instant claim, a possessory land claim, is subject to the doctrine of laches, we conclude that the present case must be dismissed because the same considerations that doomed the Oneidas' claim in *Sherrill* apply with equal force here. These considerations include the following: "[g]enerations have passed during which non-Indians have owned and developed the area that once composed the Tribe's historic reservation," *Sherrill*, 125 S.Ct. at 1483; "at least since the middle years of the 19th century, most of the [Tribe] have resided elsewhere," *id.*; "the longstanding, distinctly non-Indian character of the area and its inhabitants," *id.*; "the distance from 1805 to the present day," *id.* at 1494; "the [Tribe's] long delay in seeking equitable relief against New York or its local units," *id.*; and "developments in [the area] spanning several generations." *Id.*; *see also id.* at 1492-93 ("[T]his Court has recognized the impracticability of returning to Indian control land that generations earlier passed into numerous private hands.") (citing *Yankton Sioux Tribe v. United States*, 272 U.S. 351, 357 (1926) ("It is impossible . . . to rescind the cession and restore the Indians to their former rights because the lands have been opened to settlement and large portions of them are now in the possession of innumerable innocent purchasers . . . .")). We thus hold that the doctrine of laches bars the possessory land claim presented by the Cayugas here.[6] The District Court, after serious consideration of this exact question, explicitly agreed with this assessment. *Cayuga X*, 1999 U.S. Dist. LEXIS 10579, at *86 ("Thus, even though some delay on the part of the Cayugas is explainable, in the context of determining whether ejectment is an appropriate remedy, . . . the delay factor tips decidedly in favor of the defendants.").

To summarize: the import of *Sherrill* is that "disruptive," forward-looking claims, a category

---

[6] *Sherrill* effectively overruled our Court's holding in *Oneida Indian Nation v. New York*, 691 F.2d 1070, 1084 (2d Cir. 1982), that laches and other time-bar defenses should be unavailable and that "suits by tribes should be held timely if such suits would have been timely if brought by the United States." We note that in a subsequent Oneida case, Judge Newman, while writing for the Court, stated that "[t]he writer accepts the prior panel's rejection of a laches defense as the law of the case, though would find the issue to be a substantial one if it were open." *Oneida Indian Nation v. New York*, 860 F.2d 1145, 1149 n.1 (2d Cir. 1988).

18

exemplified by possessory land claims, are subject to equitable defenses, including laches. Insofar as the Cayugas' claim in the instant case is unquestionably a possessory land claim, it is subject to laches. The District Court found that laches barred the possessory land claim, and the considerations identified by the Supreme Court in *Sherrill* mandate that we affirm the District Court's finding that the possessory land claim is barred by laches. The fact that, nineteen years into the case, at the damages stage, the District Court substituted a monetary remedy for plaintiffs' preferred remedy of ejectment[7] cannot salvage the claim, which was subject to dismissal *ab initio*. To frame this point a different way: if the Cayugas filed this complaint today, exactly as worded, a District Court would be required to find the claim subject to the defense of laches under *Sherrill* and could dismiss on that basis.

Although we conclude that plaintiffs' ejectment claim is barred by laches, we must also consider whether their other claims, especially their request for trespass damages in the amount of the fair rental value of the land for the entire period of plaintiffs' dispossession, are likewise subject to dismissal. In assessing these claims, we must recognize that the trespass claim, like all of plaintiffs' claims in this action, is predicated entirely upon plaintiffs' possessory land claim, for the simple reason that there can be no trespass unless the Cayugas possessed the land in question. *See, e.g., West 14th Street Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188, 195 (2d Cir. 1987) (holding that a trespass cause of action must allege possession). Inasmuch as plaintiffs' trespass claim is based on a violation of their constructive possession, it follows that plaintiffs' inability to secure relief on their ejectment claim alleging constructive possession forecloses plaintiffs' trespass claim. In other words, because plaintiffs are barred by laches from obtaining an order conferring possession in ejectment, no basis remains for finding such constructive possession or immediate right of possession as could

---

[7] After finding for plaintiffs on liability and ruling out ejectment as a remedy, the District Court seems to have folded all of the plaintiffs' requests for relief into its award of damages, without separate consideration of any of the requests for relief. *See Cayuga XI*, 79 F. Supp. 2d at 70. Our conclusion that the award of damages stems entirely from the ejectment claim follows from the District Court's approach.

support the damages claimed. Because the trespass claim, like plaintiffs' other requests for relief, depends on the possessory land claim, a claim we have found subject to laches, we dismiss plaintiffs' trespass claim, and plaintiffs' other remaining claims, along with the plaintiffs' action in ejectment.

We recognize that the United States has traditionally not been subject to the defense of laches. *See United States v. Summerlin*, 310 U.S. 414, 416 (1940). However, this does not seem to be a *per se* rule. *See, e.g., Clearfield Trust Co. v. United States*, 318 U.S. 363, 369 (1943) (holding that laches is a defense to the United States in its capacity as holder of commercial paper). Judge Posner has aptly noted that "the availability of laches in at least some government suits is supported by Supreme Court decisions, notably *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 373 (1977); *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 60-61 (1984); and *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95-96 (1990), that refuse to shut the door completely to the invocation of laches or estoppel (similar doctrines) in government suits." *United States v. Administrative Enterprises, Inc.*, 46 F.3d 670, 672-73 (7th Cir. 1995). Indeed, the Seventh Circuit has made clear that, in appropriate circumstances, laches can apply to suits by the federal government. *See NLRB v. P*I*E Nationwide, Inc.*, 894 F.2d 887, 894 (7th Cir. 1990) ("Following dictum in *Occidental Life* and the general principle noted earlier that government suits in equity are subject to the principles of equity, laches is generally and we think correctly assumed to be applicable to suits by government agencies as well as by private parties.") (internal citations omitted).

Notwithstanding our conclusion that the United States as plaintiff-intervenor is subject to laches in this case, we do not purport to set forth broad guidelines for when the doctrine might apply. Rather, we follow the Seventh Circuit, which, after canvassing the case law, noted in *Administrative Enterprises* that there are three main possibilities for when laches might apply against the United States: first, "that only the most egregious instances of laches can be used to abate a government suit";

second, "to confine the doctrine to suits against the government in which . . . there is no statute of limitations"; and third, "to draw a line between government suits in which the government is seeking to enforce either on its own behalf or that of private parties what are in the nature of private rights, and government suits to enforce sovereign rights, and to allow laches as a defense in the former class of cases but not the latter." *Administrative Enterprises*, 46 F.3d at 673 (internal citations omitted). We need not decide which of these three possibilities might govern because this case falls within all three. First, given the relative youth of this country, a suit based on events that occurred two hundred years ago is about as egregious an instance of laches on the part of the United States as can be imagined; second, though there is now a statute of limitations, *see* 28 U.S.C. § 2415(a), there was none until 1966—*i.e.*, until one hundred and fifty years after the cause of action accrued; and third, the United States intervened in this case to vindicate the interest of the Tribe, with whom it has a trust relationship.[8] Accordingly, we conclude that whatever the precise contours of the exception to the rule against subjecting the United States to a laches defense, this case falls within the heartland of the exception.

We acknowledge that we stated in *Oneida Indian Nation v. New York*, 691 F.2d 1070 (2d Cir. 1982), that "[i]t is clearly established that a suit by the United States as trustee on behalf of an Indian tribe is not subject to state delay-based defenses." *Id.* at 1084. That opinion, however, left open the possibility of asserting delay-based defenses founded on federal law in these circumstances. *See id.* (stating that "[t]here remains the question whether a delay-based defense founded on federal law may be asserted" and concluding that because the suit was within the statute of limitations of 28 U.S.C. § 2415, the suit was timely in any case). In light of *Sherrill*, which, as noted above, we read to have

---

[8] Our holding here thus does not disturb our statement in *United States v. Angell*, 292 F.3d 333, 338 (2d Cir. 2002), that "laches is not available against the federal government when it undertakes to enforce a public right or protect the public interest," inasmuch as this case does not involve the enforcement of a public right or the protection of the public interest.

substantially altered the legal landscape in this area, we conclude that the federal law of laches can apply against the United States in these particular circumstances.

The Cayugas and the United States highlight the District Court's findings, in deciding whether to award prejudgment interest, that the Cayugas were not "responsible for any delay in bringing this action" and that the "delay was not unreasonable, insofar as the actions of the Cayuga are concerned." Cayuga Letter Br. at 3, United States Letter Br. at 3. We acknowledge these findings, but do not believe they are dispositive for our consideration of the laches question. The equitable considerations relevant to an assessment of a possessory land claim—which is precisely what this case was from the outset—differ dramatically from the equitable considerations in a claim for prejudgment interest, which is what the case had become at the time the District Court made these findings. The District Court itself, as discussed above, found that laches barred the Cayugas' preferred remedy of ejectment. Indeed, the District Court noted that "[r]egardless of when the Cayugas should have or could have commenced this lawsuit, the court cannot overlook the prejudicial consequences which the defendants would sustain if the court were to order ejectment," and found that the "prejudice factor" was "a factor which is far too important to ignore." *Cayuga X*, 1999 U.S. Dist. LEXIS 10579, at *85-86. In light of these findings, and the Supreme Court's ruling in *Sherrill*, we see no need to remand to the District Court for a determination of the laches question.

Our decision to reverse the judgment of the District Court and enter judgment for defendants should in no way be interpreted as a reflection on the District Court's efforts and rulings in this case. We recognize and applaud the thoughtful and painstaking efforts, over many years, of Judge Neil P. McCurn, who presided over this and related land claims in upstate New York with fairness and due regard to the rights and interests of all parties as well as with a keen appreciation of the complexities of the subject matter and of the relevant law. Our decision is based on a subsequent ruling by the

Supreme Court, which could not be anticipated by Judge McCurn in his handling of this case over more than twenty years.

The judgment of the District Court is **REVERSED** and judgment is entered for defendants.

JANET C. HALL, *District Judge*, dissenting in part and concurring in part in the judgment:

While *City of Sherrill v. Oneida Indian Nation*, 125 S.Ct. 1478 (2005), has an impact on this case, it does not compel the conclusion that the plaintiffs are without any remedy for what the District Court found to be the illegal transfer of their land. My understanding of *City of Sherrill* is that it supports the majority's conclusion that the plaintiffs cannot obtain ejectment of those currently in possession of the land which was, over 200 years ago, the Cayuga Nation's Original Reservation. However, based on the nature of the claims long asserted in this case, the elements of the defense of laches, and the language and precedent relied on in *City of Sherrill*, I cannot join the majority in its conclusion that laches bars all of the plaintiffs' remedies, including those for money damages. Therefore, I respectfully dissent in part and concur in part in the judgment.

I.      **Procedural History**

The majority sets forth an excellent summary of the extensive background to this appeal. There are, however, a few procedural aspects of the record that bear noting.

The history of this case makes clear that the Cayuga plaintiffs[1] have, from its filing, asserted multiple causes of action and sought multiple remedies. The complaint states a claim, inter alia, for trespass damages. The Cayuga plaintiffs allege that "[a]ll of the defendants are in trespass" and that "[t]he defendants are keeping plaintiffs out of possession of their land in violation of the common law and 25 U.S.C. §177 (The Non-Intercourse Act)." Cayuga Indian Nation Compl. at ¶ 50. The Cayuga plaintiffs sought several forms of relief, including declaratory relief, ejectment, an accounting, and trespass damages for the fair rental value of the land. It bears noting that the statute of limitations established by Congress did not expire until approximately three years following the date this action was filed. 28 U.S.C. § 2415(a) ("for those claims that are on either of the two lists published pursuant

---

[1]  "Cayuga plaintiffs" refers collectively to the Cayuga Indian National and the Seneca-Cayuga Tribe.

24

to the Indian Claims Limitations Act of 1982, any right of action shall be barred unless the complaint is filed within (1) one year after the Secretary of the Interior has published in the Federal Register a notice rejecting such claim . . ."); *see also* 48 Fed. Reg. 13920 (Mar. 31, 1983) (listing Cayuga's "Nonintercourse Act Land Claim"); *see also County of Oneida v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 243 (1985) ("*Oneida II*") ("So long as a listed claim is neither acted upon nor formally rejected by the Secretary, it remains live.")

While the majority may be correct that "ejectment is [the plaintiffs'] preferred remedy," Maj. Op. at __, there is certainly nothing in the record to suggest that the Cayuga plaintiffs relinquished their claims for money damages. *See, e.g., Cayuga Indian Nation v. Cuomo*, 565 F. Supp. 1297, 1305-06 (N.D.N.Y. 1983) ("*Cayuga I*") ("With respect to the common law bases for their claim, references are made in plaintiffs' papers to 'ejectment', 'trespass', 'waste' and 'conversion', either as analogous forms of action or as indices of damages."). Indeed, federal common law provides the Cayuga plaintiffs with a variety of remedial theories. "The Supreme Court has recognized a variety of federal common law causes of action to protect Indian lands from trespass, including actions for ejectment, accounting for profits, and damages." *U.S. v. Pend Oreille Pub. Util. Dist. No. 1*, 28 F.3d 1544, 1549 n.8 (9th Cir. 1994), *cert. denied*, 514 U.S. 1015 (1995). The District Court found that, "the plaintiffs are not specifying a single source for their substantive possessory right, or a single source for their right of action" and read the complaint and the plaintiffs' papers to state a claim "derived from the Nonintercourse Act itself or from federal common law." *Cayuga I*, 565 F.Supp. at 1306. Such a claim has been recognized to include as a remedy a monetary award for damages. *Oneida II*, 470 U.S. at 235-40. Thus, the plaintiffs here have sought money damages from the filing of this case.

The District Court addressed the application of equitable defenses early in the case, when it considered the non-state defendants' argument "that the equitable remedies of rescission and

restitution are no longer available where the use and the value of the land has changed drastically, and where it is held by innocent purchasers."[2] *Cayuga I*, 565 F.Supp. at 1310. The court concluded on the basis of Second Circuit precedent that, while laches did not bar the Cayuga plaintiffs' claims, it may later become relevant with respect to the relief sought. *Id.*

After the District Court held that the 1795 and 1807 land conveyances to New York State were invalid, *Cayuga Indian Nation v. Cuomo*, 730 F. Supp. 485, 493 (N.D.N.Y. 1990) ("*Cayuga III*"), the District Court again faced the question of laches. *Cayuga Indian Nation v. Cuomo*, 771 F. Supp. 19, 20 (N.D.N.Y. 1991) ("*Cayuga V*"). However, the District Court again relied on pre-*City of Sherrill* precedent to find that the action had been filed timely and that laches did not apply. *Id.* at 20-24 (citing *Oneida Indian Nation of New York v. Oneida County*, 719 F.2d 525, 538 (2d Cir. 1983); *Oneida Indian Nation of New York v. New York*, 691 F.2d 1070, 1084 (2d Cir. 1982)).

On November 5, 1992, the United States filed a motion to intervene. It did so both on its own behalf and as trustee to the tribe. In its Answer to the United States' Complaint in Intervention, which, *inter alia*, sought trespass damages, the State alleged that the common law defense of laches barred the claims of and relief sought by the United States. The District Court never reached the question of whether laches could be asserted against the United States in this case because the parties stipulated that the court's previous rejection of the defense as to the other plaintiffs would apply with equal force as to the United States.

Following the District Court's grant of partial summary judgment on the question of liability, the defendants then moved to preclude ejectment as a remedy. The court found "that from the outset ejectment is one of several remedies which the Cayugas have been seeking, and their claims also have

---

[2] Notably, at that time, the defendants did not raise the defense of laches, an equitable defense, to any of the plaintiffs' non-equitable claims. *Cayuga I*, 565 F.Supp. at 1310 (discussing application of delay-based defenses to availability of equitable remedies of rescission and restitution).

been framed in terms of ejectment." *Cayuga Indian Nation v. Cuomo*, 1999 U.S. Dist. LEXIS 10579, at *58 (N.D.N.Y. July 1, 1999) ("*Cayuga X*"). Following the reasoning in *United States v. Imperial Immigration Dist.*, 799 F. Supp. 1052 (S.D. Cal. 1992), the District Court treated the ejectment remedy as a request for a permanent injunction. The court considered the factors iterated by the Restatement (Second) of Torts for application to requests for injunctions against trespass. *Cayuga X*, 1999 U.S. Dist. LEXIS 10579, at *62-63. The District Court did so because, as noted in *Imperial Immigration*, "an equitable analysis is appropriate before issuing any final orders *other than for monetary damages*." 799 F.Supp. at 1068 (quoted in *Cayuga X*, 1999 U.S. Dist. LEXIS 10579, at *62) (emphasis added).

After considering the interest to be protected, the relative adequacy of various remedies, delay, misconduct, and relative hardship, the interests of third parties, and the practicability of an injunction, *see Restatement (Second) of Torts* § 936(1)(a)-(g), the District Court granted the defendants' motion to preclude ejectment as a remedy.[3] *Cayuga X*, 1999 U.S. Dist. LEXIS 10579, at *99. The court then dismissed those defendants against whom the plaintiffs had sought ejectment and no other remedies. *Id.* Those defendants against whom the plaintiffs had sought other remedies remained in the case. While the majority states that the District Court "monetized" the remedy, *supra* at 15, as I understand the term, it is only partially correct.[4] Instead, it rejected an ejectment remedy based on equitable considerations, including the remedial adequacy of money damages, and allowed the plaintiffs to pursue other remedies.[5]

---

[3] Thus, contrary to the majority's assertion, the District Court did not find "that laches barred the possessory claim," Maj. Op. at __, but rather concluded that equitable considerations prevented the award of the equitable remedy of possession.

[4] Fair rental value damages, as a monetary remedy, had been sought since the filing of the case.

[5] The power of a court sitting in equity to award monetary relief as, or in place of, an equitable remedy has long been recognized. *Cathcart v. Robinson*, 30 U.S. 264, 278 (1831) (Marshall, C.J.); *see also Mora v. United States*, 955 F.2d 156, 159-160 (2d Cir. 1992).

## II. Application of Laches to the Plaintiffs' Claims for Damages

The issue before this court – "the application of a nonstatutory time limitation in an action for damages" – has not been addressed by the Supreme Court. *See City of Sherrill*, 125 S.Ct at 1494 n.14 (citing *Oneida II*, 470 U.S. at 244[6]). To extend this defense to the Tribe's claim for money damages would be "novel indeed." *Oneida II*, 470 U.S. at 244 n.16. The majority argues that, "[o]ne of the few incontestable propositions about this unusually complex and confusing area of law is that doctrines and categorizations applicable in other areas do not translate neatly to these claims."[7] Maj. Op. at __ Such complexity is best addressed by relying on relevant precedent and established principles. Congressional action and centuries of precedent with regard to both Indian land claims and foundational distinctions between rights and remedies, coercive relief and damages, and legal claims and equitable relief, should guide the attempt to resolve this historic dispute.

The plaintiffs here seek relief under two theories, ejectment and trespass. As noted, all claims were brought prior to expiration of the relevant statute of limitations. Historically, both ejectment and trespass are actions at law. Dan B. Dobbs, *Law of Remedies* §§ 5.1, 5.10(1) (2d ed. 1993). Unless a party's delay amounts to either an estoppel or waiver, it does not bar a party's access to remedies at law. *Id.* at § 2.4(4) ("When laches does not amount to estoppel or waiver, it does not ordinarily bar legal claims, only equitable remedies."). Furthermore, laches is not a complete defense to a claim. "Because laches is based on prejudice to the defendant, the bar it raises should be no broader than the

---

[6] Although the *Oneida II* majority did not reach the question, it did observe that "it is far from clear that this [laches] defense is available in suits such as this one [for money damages], . . . ." *Oneida II*, 470 U.S. at 244. The Court further noted that "application of the equitable defense of laches in an action at law would be novel indeed." *Id.* at 244 n.16.

[7] The cases cited by the majority in support of this point, to the extent that they suggest that Indian land claims are to be treated different from non-Indian claims, strongly suggest that Indian claims are entitled to more protection, rather than less, as a result of strong federal policy protecting tribal title from application of state law. *See Mohegan Tribe v. Connecticut*, 638 F.2d 612, 614-15 (2d Cir. 1980); *Oneida II*, 470 U.S. at 240-44.

prejudice shown." *Id.*

### A.  Ejectment and Laches

An action for ejectment generally seeks two remedies, restoration of possession and damages equivalent to the fair market rent for the period the plaintiff was wrongfully out of possession, sometimes referred to as *mesne profits. Id.* at § 5.10(1). Reinstatement of one's possessory interest in land is typically the most salient of the two remedies. It is hardly surprising, therefore, that some jurisdictions have chosen to make the doctrine of laches available to defendants in ejectment actions where a coercive remedy is sought. *See* Maj. Op. at __. New York courts have held, for example, that "[a]n equitable defense is good in ejectment." *Dixey v. Dixey*, 196 A.D. 352, 354 (2d Dep't 1921) (citing *Phillips v. Gorham*, 17 N.Y. 270 (1858)).

The defense of laches pertains only to the remedy sought, not the cause of action itself. The elements of laches are both delay and prejudice. *City of Sherrill*, 125 S.Ct. at 1491 ("laches, a doctrine focused on one side's inaction and the other's legitimate reliance, may bar long-dormant claims for equitable relief"); *Kansas v. Colorado*, 514 U.S. 673, 687 (1995) ("The defense of laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." (internal quotations omitted)); *Penn Mut. Life Ins. Co. v. City of Austin*, 168 U.S. 685, 698 (1898) ("The reason upon which the rule [of laches] is based is not alone the lapse of time during which the neglect to enforce the right has existed, but the changes of condition which may have arisen during the period in which there has been neglect."); *see also* Fred F. Lawrence, *A Treatise on the Substantive Law of Equity Jurisprudence*, §1037 (1929) ("Being, like all other equitable relief, purely protective, it is not to be inferred from delay alone, but rather from the consequences which may under the circumstances flow from it."). The nature of the remedy sought will necessarily change the court's analysis of the effect of delay. "[E]quity may, in the exercise of its own inherent powers, refuse

29

relief where it is sought after undue and unexplained delay, and when injustice would be done, in the particular case, by granting the relief asked." *Abraham v. Ordway*, 158 U.S. 416, 420 (1895) (emphasis added). "[L]aches is not, like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced." *Galliher v. Cadwell*, 145 U.S. 368, 373 (1892). Thus, the application of the equitable defense of laches is, by its nature and function, confined by the particular prejudice caused by the remedy.

However, where a plaintiff seeks ejectment damages, rather than restoration of a possession interest, application of the doctrine of laches to such a money damage claim is rarely if ever justified. Even where reinstatement of possession is disruptive, attendant damage claims are not similarly disruptive. It is axiomatic that a menu of remedies, some mutually exclusive, may be associated with the same right and that, in different factual situations, different remedies will be appropriate. Here, the plaintiffs' claims for possession and for fair rental value damages should be treated separately. While the element of delay found in connection with application of the defense to the possession remedy is equally present with regard to the money damages remedy, there is no corresponding prejudice to the defendant New York State ("State") in connection with an award of money damages. The bar of laches does not rise high enough to bar the money judgment here. *See* Dobbs, *supra,* § 2.4(4).

Determining that the coercive remedy of restoration of possession is barred by laches requires a fact-intensive inquiry regarding the disruptiveness of that remedy. In *City of Sherrill*, for example, the Court found that the defendants in that case had "justifiable expectations" which were "grounded in two centuries of New York's exercise of regulatory jurisdiction." 125 S.Ct. at 1490-91. The Supreme Court held that the remedy sought by the Oneida Indian Nation -- the reassertion of sovereignty resulting in "a checkerboard of state and tribal jurisdiction" over a checkerboard of land -- was

30

disruptive to justifiable expectations regarding the state, and therefore local, regulatory authority over territory. *Id.* at 1482. The *City of Sherrill* Court concluded, in the face of two hundred years of sovereign control by the State of New York and its municipalities, that the reassertion of tribal sovereignty would be "disruptive." *Id.* at 1491.

*City of Sherrill* would thus support a finding that restoration of possession, following two hundred years of unlawful possession, is a sufficiently disruptive remedy that it may satisfy the prejudice element of the laches defense. However, the proof involved with the remedy of damages will be radically different than that involved with a claim for an injunction, specific performance, or equitable re-possession in real property. Indeed, there does not appear to be anything in the money damages award in this case that would be disruptive.

The majority concludes that the plaintiffs' "possessory land claims" are barred in their entirety by *City of Sherrill* and reasons that the plaintiffs, having been denied the right to possession, cannot prove the elements of their claims for money damages. However, current possession is not an element of a legal claim for ejectment. A legal claim for ejectment consists of the following elements: "[p]laintiffs are out of possession; the defendants are in possession, allegedly wrongfully; and the plaintiffs claim damages because of the allegedly wrongful possession." *Oneida Indian Nation of N.Y. v. County of Oneida, N.Y.*, 414 U.S. 661, 683 (1974) ("*Oneida I*") (citing *Taylor v. Anderson*, 234 U.S. 74 (1914)). Making out this claim cannot depend on the plaintiffs' ability to obtain the right to *future* possession, whether legal or constructive, as such requirement would make the claim circular. Instead, the only necessary element in this regard is that the plaintiffs are wrongfully out of possession, which element the District Court here found. *Cayuga III*, 730 F.Supp. at 493. The inability to obtain the coercive remedy of possession, as a result of the court's exercise of discretion in the same case, should not bar an ejectment claim for money damages.

31

## B.     Trespass

While the majority does not appear to apply the laches defense to a claim for trespass damages, it nevertheless dismisses the plaintiffs' trespass claim on the basis that it is derivative of the ejectment claim and requires proof of possession.  The fact that "possession" is an element of a claim for trespass does not require dismissal of the action, however.  The trespass claim is not predicated upon the plaintiffs' possessory claim, nor is there any relationship between the two claims that necessitates dismissal of the trespass claim.  Indeed, the plaintiffs may be able to prove the right to possession[8] while being unable to obtain a coercive remedy that would restore them in the future to physical possession.

The majority's contention that the plaintiffs cannot make out their claim for damages because their claim for coercive relief fails treats the special defense of laches as if it were in the nature of a statute of repose.  However, nowhere in *City of Sherrill* is the "right" of possession addressed; the Court writes always about the "remedy" of possession.  *See, e.g.*, *City of Sherrill*, 125 S.Ct. at 1489.  Courts have discretion to apply laches to deny a party some or all remedies.  *See supra* at __.  However, the defense of laches does not apply to prevent a party from establishing an element of its cause of action.  *See Felix v. Patrick*, 145 U.S. 317, 325 (1892) (discussed in *City of Sherrill*, 125 S.Ct. at 1491-92).  Perhaps if laches were a doctrine akin to a statute of repose, such that, first, it applied to a legal claim and, second, it vitiated the claim, the majority's analysis that claims involving the right to possess are barred by laches because laches bars the remedy of possession might be persuasive.  *See generally P. Stolz Family P'ship v. Daum*, 355 F.3d 92, 102 (2d Cir. 2004) (discussing difference between statutes of repose, which define and limit rights, and statutes of limitations, which "bear on available remedies").

---

[8]  There are issues on appeal concerning the rulings by the District Court that the plaintiffs have a right to possession because the land transfers were illegal.

Nothing in the case law concerning laches, however, supports such an analysis.

## C.  United States as Plaintiff

The United States is a plaintiff in this case.  "The principle that the United States are not . . . barred by any laches of their officers, however gross, in a suit brought by them as a sovereign Government to enforce a public right, or to assert a public interest, is established past all controversy or doubt." *United States v. Beebe*, 127 U.S. 338, 344 (1888) (quoted in *Alaska Dep't of Envtl. Conservation v. EPA.*, 540 U.S. 461, 514 (2004) (Kennedy, J., dissenting)); *see also United States v. Summerlin*, 310 U.S. 414, 416 (1940).  In the instant case, the United States pursues a right created by a federal statute and proceeds in its sovereign capacity and, as such, is not subject to a laches defense.  *Summerlin*, 310 U.S. at 417; *c.f.*, *United States v. California*, 507 U.S. 746, 757-58 (1993).  That the United States acts both on its own behalf as well as that of the Cayugas does not affect this principle for "it is also settled that state statutes of limitation neither bind nor have any application to the United States, when suing to enforce a public right or to protect interests of its Indian wards."  *United States v. Minnesota*, 270 U.S. 181, 196 (1926); *see also Nevada v. United States*, 463 U.S. 110, 141-42 (1983); *Board of County Comm'rs of Jackson County v. United States*, 308 U.S. 343, 350-51 (1939).

The majority explains its application of the defense of laches to claims asserted by the United States by suggesting that the doctrine that the United States is generally not subject to the defense of laches "does not seem to be a *per se*" rule.  *See* Maj. Op. at __.  For this point, it relies upon *Clearfield Trust Co. v. United States.* 318 U.S. 363 (1943).  However, that case is distinguishable from the instant one in two important respects, both of which exclude this case from the limited holding reached in *Clearfield Trust*.

First, the Court in *Clearfield Trust* limited its application of non-statutory time bars to those claims brought by the United States that were not subject to any statutory time bar.  *Id.* at 367 ("In

33

absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards."). The claims in this case are subject to a statutory time bar. *See* 28 U.S.C. § 2415; *see also supra* at 1-2. As Congress has already defined the applicable time bar, *Clearfield Trust* supports the conclusion that this court should not reach the question of whether it ought to fashion a time-bar, whether from state law or federal common law. *See id.* at 367; *see also Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO*, 451 U.S. 77, 95 (1981) ("the federal lawmaking power is vested in the legislative, not the judicial, branch of government; therefore federal common law is 'subject to the paramount authority of Congress.' *New Jersey v. New York*, 283 U.S. 336, 348 (1931)"); *Westnau Land Corp. v. United States Small Bus. Admin.*, 1 F.3d 112, 117 (2d Cir. 1993) ("[T]he acknowledged federal interest in the 'rights of the United States arising under nationwide federal programs,' *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979), should be determined by application of the statutory rule provided by Congress.").

Second, the *Clearfield Trust* Court limited the application of laches to those claims deriving not from the sovereign authority and rights of the United States but, instead, relating to the actions of the United States with respect to business and commerce. *Clearfield Trust*, 318 U.S. at 369 ("The United States as drawee of commercial paper stands in no different light than any other drawee."); *see also Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002) (citing *Clearfield Trust* for the proposition that "[o]nce the United States waives its immunity and does business with its citizens, it does so much as a party never cloaked with immunity."); *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 607 (2000) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." (internal quotation marks omitted)). In the instant case, the United States is not a commercial actor. Here, it acts both "to enforce a public right [and] to protect interests of its Indian wards." *United States*

*v. Minnesota*, 270 U.S. at 196. It is clear, then, that the United States's claims in this case, both on its own behalf and as trustee to the Tribe, are not barred by laches.

After relying on *Clearfield Trust* to open the door for application of laches to claims by the United States, the majority then finds that the defense is appropriate in the instant case. In doing so, it relies on a Seventh Circuit case for the proposition that three Supreme Court cases support the application of laches in cases such as this one. *United States v. Admin. Enters., Inc.*, 46 F.3d 670, 673 (7th Cir. 1995) (citing *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 373 (1977); *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 60-61 (1984); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95-96 (1990)).

However, neither *Administrative Enterprises*, nor the cases cited therein, support the application of laches to the United States in the instant case. Of the three cases cited by *Administrative Enterprises*, only one specifically addresses the applicability of a delay-based defense like laches in a suit brought by the United States.[9] *Occidental Life*, 432 U.S. at 373. The *Occidental Life Insurance* Court declined to allow delay to bar a claim by the United States. *Id.* To the extent that it "refuse[d] to shut the door completely to the invocation of laches or estoppel," *Administrative Enterprises, Inc.*, 46 F.3d at 673, it did so, in dicta, only where a "private plaintiff's unexcused conduct of a particular case" made limitations on *relief*, specifically backpay, appropriate. *Occidental Life*, 432 U.S. at 373. *Occidental Life*, thus, differentiates between claims and remedies, and unexcused delay by private plaintiffs and the United States. *Id.* It does not support application of laches here, where the majority applies the defense to

---

[9] *Heckler* concerns estoppel, not laches, but does confirm as "well settled" precedent that "the Government may not be estopped on the same terms as any other litigant." 467 U.S. at 60. *Irwin* addresses equitable tolling and concludes that the statute of limitations on a private party's claim against the United Statutes may be equitably tolled where the statutory waiver of sovereign immunity allowing for the private right action also makes the rule of equitable tolling applicable to the United States. 498 U.S. at 95-96. Notably, the Court commented that "Congress, of course, may provide otherwise if it wishes to do so." *Id.* at 96.

bar the claim itself, rather than a specific remedy for the claim.[10]

These cases cannot support the proposition that this Court has the authority to craft a federal common law defense of laches against an Indian land claim sought by the United States. Indeed, *Administrative Enterprises'* "three main possibilities for when laches might apply against the United States," Maj. Op. at \_\_, are not present in this case. With regard to *Administrative Enterprises'* first "possibility," egregious delay, while two hundred years is surely a significant length of time, the majority fails to consider the nature of that delay and to what extent it may be excused. With regard to *Administrative Enterprises'* second "possibility," the absence of an applicable statute of limitations, here Congress did enact a statute of limitations applicable to the plaintiffs' claims for damages. 28 U.S.C. §2415(a).[11] With regard to *Administrative Enterprises'* third "possibility," situations where the United States pursues a "private" interest, the Supreme Court has found that, insofar as it acts on behalf of Indian tribes, the United States acts to protect a public interest, entirely dissimilar from the private interest served where the United States pursues an action based on its purely commercial endeavors. *See United States v. Minnesota*, 270 U.S. 181, 196 (1926) (describing United States' role in serving public interest by protecting "interests of its Indian wards."). Indeed, it is in its role as a sovereign that the United States participate in this case. *Id.* at 194 (United States' interest in suit in which it represents Indians' interests as trustee is based in its own sovereignty.). Thus, even if *Administrative Enterprises* were persuasive precedent, this case presents none of its suggested possible

---

[10]  Another case, *NLRB v. P\*I\*E Nationwide, Inc.,* is relied on by the majority for the proposition that "laches is generally and we think correctly assumed to be applicable to suits by government agencies . . . ." *Supra* at **[Majority at 21/2-5]** (quoting 894 F.2d 887, 894 (7th Cir. 1990)). That case, however, limits the court's equitable discretion to areas where neither Congress nor a federal agency has made a "value choice" contrary to the exercise of equitable discretion of the court. *P\*I\*E Nationwide, Inc.*, 894 F.2d at 894 ("[W]e do not mean to suggest that the court is entitled to substitute its conception . . . for that of Congress . . ."). Congress has spoken on the issue of time bars to Indian land claims. While distinguishing between remedies may be appropriate, barring those claims entirely ignores the controlling statute.

[11]  That § 2415(a) applies only to actions for money damages supports the conclusion that laches cannot be applied to bar a claim for money damages, but may be applied to bar a claim for equitable relief.

36

situations justifying use of laches against the United States..

### III. The Import of *City of Sherrill*

The majority sees "no reason why the equitable principles identified by the Supreme Court in *City of Sherrill* should not apply to this case, whether or not it could be technically classified as an action at law." Maj. Op. at __. However, the clear language of *City of Sherrill* confines its holding to the use of laches to bar certain relief, not to bar a claim or all remedies:

> "The question whether equitable consideration should limit the *relief* available to the present day Oneida Indians . . . ." *City of Sherrill*, 125 S.Ct. at 1487 (quoting *Oneida II*, 470 U.S. at 253, n. 27) (emphasis added).

> "In contrast to *Oneida I* and *II*, which involved demands for monetary compensation, OIN sought equitable *relief* prohibiting, currently and in the future, the imposition of property taxes." *Id.* at 1488 (emphasis added).

> "When the Oneidas came before this Court 20 years ago in *Oneida II*, they sought money damages only. The court reserved for another day the question whether 'equitable considerations' should limit the *relief* available to the present-day Oneidas." *Id.* at 1489 (internal citations omitted) (emphasis added).

> "The principle that the passage of time can preclude *relief* has deep roots in our law. . . . It is well-established that laches, a doctrine focused on one side's inaction and the other's legitimate reliance, may bar long-dormant claims for *equitable relief*." *Id.* at 1491 (emphasis added).

> " . . . the Oneida's long delay in seeking equitable *relief* . . . evokes the doctrine[] of laches . . ." *Id.* at 1494.

The *City of Sherrill* opinion is not support for the application of the equitable defense of laches as a bar to money damages in this case.[12]

The *City of Sherrill* Court's analysis, which underpins its holding, is framed by the nature of the equitable remedy that the Oneida Indian Nation sought there. *See* 125 S.Ct. at 1488 ("OIN sought

---

[12] It is also telling that Justice Stevens noted in dissent that the majority "relie[d] heavily on the fact that the Tribe is seeking *equitable relief* in the form of an injunction." *Id.* at 1496 (Stevens, J., dissenting) (emphasis in the original and added).

equitable relief"); *id.* at 1489 ("OIN seeks declaratory and injunctive relief"); *id.* at 1491 ("This long lapse of time, during which the Oneidas did not seek to revive their sovereign control through equitable relief in court, and [evidence of prejudice] . . . preclude OIN from gaining the disruptive remedy it now seeks."); *id.* at 1494 ("long delay in seeking equitable relief"); *id.* at 1494 n.14 ("specific relief"). This language makes clear that the *City of Sherrill* Court addresses laches in the context of the specific equitable relief sought in that case. Further, it repeatedly notes the difference between a right and a remedy. As the *City of Sherrill* Court notes, the question of right is "very different" from the question of remedy. *Id.* at 1489 (quoting Dan B. Dobbs, *Law of Remedies* § 1.2 (1st ed.1973)). The *City of Sherrill* Court also quotes with approval a Tenth Circuit case for the principle that "the distinction between a claim or substantive right and a remedy is fundamental." *Id.* at 1489 (quoting *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1467 (10th Cir. 1987). As if to emphasize this point, and its importance to the opinion, the *City of Sherrill* Court also quotes, with approval, the district court in *Oneida Indian Nation of New York v. County of Oneida* on this distinction between right and remedy. "[There is a] 'sharp distinction between the *existence* of a federal common law right to Indian homelands,' a right this Court recognized in *Oneida II*, 'and how to *vindicate* that right.'" *City of Sherrill*, 125 S.Ct. at 1488 (quoting *Oneida Indian Nation of N.Y. v. County of Oneida*, 199 F.R.D. 61, 90 (N.D.N.Y. 2000) (emphasis in original).

Further, the Supreme Court in *City of Sherrill* addresses at length an Indian land claim case, *Felix v. Patrick*, 145 U.S. 317 (1892). 125 S.Ct. at 1491-92. While the *Felix* Court applied laches to bar the equitable remedy of a constructive trust over land conveyed by the plaintiff's Indian ancestor in violation of a statutory restriction, the Court noted, in *dicta,* that a money damages award would be appropriate. *Felix*, 145 U.S. at 334. While the law demanded a measure of money damages, the delay and prejudice due to changed circumstances over thirty years supported the application of the doctrine

of laches to the equitable remedy of constructive trust. *Id.* at 333-34; *see City of Sherrill*, 125 S.Ct. at 1491-92.

Finally, the *City of Sherrill* Court expressly noted that, "the question of damages for the Tribe's ancient dispossession is not at issue in this case, and we therefore do not disturb our holding in *Oneida II*." 125 S.Ct. at 1494. While this statement is not dispositive of whether laches would apply here to bar a money damage award, the Court in *City of Sherrill* did reiterate its observation in *Oneida II* that "application of a nonstatutory time limitation in an action for damages would be 'novel.'" *Id.* at 1494 n.14. (quoting *Oneida II*, 470 U.S. at 244). In contrast, it noted that "no similar novelty exists when the specific *relief* OIN now seeks would project redress for the Tribe into the present and future." *Id.* (emphasis added). In light of the clear language and the analysis in *City of Sherrill*, the conclusion that *City of Sherrill* limits the application of the equitable defense of laches to the award of forward-looking, disruptive equitable relief is compelling.[13]

Further, even assuming laches could apply to the money damages award in this case, there is nothing in the record before us to support a finding of the disruptive nature of the monetary award. *See* Maj. Op. at __. The *City of Sherrill* decision certainly supports affirming the District Court's denial of repossession as an equitable remedy, based on the District Court's findings that the equitable considerations involved in the case did not permit it. *See Cayuga X*, 1999 U.S. Dist. LEXIS 10579, at *74-*99.[14] However, there is no basis to support such a finding on the prejudice element with regard

---

[13] The contention that a damages award for either past fair rental value or present fair market value would "project redress into the present and future," Maj. Op. at __, in order to bring that award within the scope of the *City of Sherrill* holding vitiates any reasonable meaning the Supreme Court could have intended that phrase to have.

[14] The District Court did not conclude, as the majority suggests, that the "doctrine of laches bars the possessory land claim presented by the Cayugas here." Maj. Op. at __. Indeed, the District Court concluded, on then-existing precedent, that laches did not bar the plaintiff's claims, *Cayuga I*, 565 F.Supp. at 1310, but it later concluded that equitable considerations did prevent the award of the equitable remedy of possession. *Cayuga X*, 1999 U.S. Dist. LEXIS 10579, at *98. Properly distinguishing between claims and remedies, the District Court concluded that, "in the context of determining whether ejectment is an appropriate remedy, the delay factor tips decidedly in favor of the defendants." *Id.* at *86.

to the award of money damages as a remedy in this case.

## IV.    Conclusion

While *City of Sherrill* may have "dramatically altered the legal landscape" of Indian land claims, Maj. Op. at __, it does not reach as far as the majority reads it. *City of Sherrill* holds that laches can bar a tribe from obtaining the disruptive remedy of re-assertion of tribal sovereignty. Furthermore, the case supports the proposition that the nature of forward-looking, disruptive remedies generally will serve as equitable considerations that can bar such equitable remedies as re-possession, even against the United States. An award of money damages is not an equitable remedy, nor is it forward-looking or disruptive in the way dispossession inherently is. Nothing in *City of Sherrill* suggests a total bar on the ability of Indian tribes to obtain damages for past wrongs where Congress has explicitly provided for it.

*City of Sherrill* serves as strong support to affirm the District Court's refusal to award possession to the plaintiffs, and I join in the judgment to that extent. However, I respectfully dissent from that part of the majority opinion which dismisses the Tribe's claim for money damages. While there remain issues as to the nature or amount of the money damages awarded, I cannot join the majority in reading *City of Sherrill* to bar all remedies.

While I do not join entirely in the majority's resolution of this case, I wholeheartedly concur in its comments concerning Judge McCurn's tireless and thoughtful attention to this complex and challenging case for over two decades.